### Bissell *v.* Heyward.

1. A. made his will, appointing C. his executor, and devising his real property in South Carolina to B. for life; and, after the determination of that estate, to C., in trust, to support certain contingent remainders in fee. A. afterwards entered into a contract to sell the property to D., who entered into possession, and paid a part of the purchase-money. A. died without receiving the balance or making a conveyance, and C. duly qualified as his executor. *Held*, that a bill by B. against C. and D., to compel the specific performance of the contract, would lie.

2. A tender of payment must, to stop interest or costs, be kept good. It ceases to have that effect when the money is used by the debtor for any other purpose.

3  A decree, or a judgment, when rendered upon a contract payable in Confederate treasury notes, should be for a sum equal to the value of those notes, not in the gold coin, but in the legal-tender currency, of the United States, at the time when and the place where they were payable.

4. Such notes can in no proper sense be regarded as commodities merely.

Appeal from the Circuit Court of the United States for the District of South Carolina.

William C. Heyward, who was seised in fee of certain lands in the State of South Carolina, made his last will and testament, bearing date Jan. 20, 1852. So much thereof as relates to them is as follows: —

" I give to my brother, Henry Heyward, of New York " (here is a description of the lands), "for and during the term of his natural life, and, after the determination of that estate, I give the same to my friend, William C. Bee, and his heirs, to prevent the contingent remainders hereinafter limited from being barred ; in trust, nevertheless, during the lifetime of my said brother, to apply the income thereof to his use and benefit; and, from and after his decease, I give the use of the same estate, real and personal, to his eldest son, Henry Heyward, Jr., if then living, until he attains the age of twenty-one years; and if he should survive his father, and attain the age of twenty-one years, to him and his heirs for ever : but in case the said Henry Heyward, Jr., should not survive his father, and attain the age of twenty-one years, then I give the whole of the said estate, real and personal, after the decease of my brother, Henry Heyward, for the use of the person who may thereafter, from time to time, sustain the character of heir male of the body of my said brother, Henry Heyward, as such term was used in the common law before the abolition of the rights of primogeniture, until such person shall attain the age of twenty-one years, or the expiration of twenty-one years from the death of my said brother, whichever may first happen ; and, after the happening of either of those events, to the then heir male of the body of my brother, absolutely and for ever."

On the eighteenth day of June, 1863, William C. Heyward contracted to sell, for $120,000, said lands, to John B. Bissell ; who took immediate possession of them, which he has ever since retained. On July 31, following, he paid $20,000 of the purchase-money. During that year, and before the completion of the purchase, Heyward died, and said Bee, appointed the executor of his will, duly qualified as such. Owing to the civil war

and other causes, matters remained unaltered in their main features until March, 1870, when said Henry Heyward, a citizen of New York, filed his bill against said Bissell and said Bee, citizens of South Carolina, to compel the specific performance, by Bissell, of his agreement to purchase. The answer of Bissell admits the agreement and his possession of the property, and his payment of $20,000; and alleges that he was provided with the means of paying the balance of the purchase-money; that neither said William C. Heyward, nor, since his death, said Bee, tendered him a conveyance; and that he was willing to pay when he should receive a valid conveyance; that he sold sixty-three bales of cotton, for cash in Confederate notes, and on Feb. 11, 1864, tendered the said balance, in said notes, to the executor, who declined to receive them, on the ground that he could not make a good title. Bee, in his answer, admitted the tender to him by Bissell, and his refusal to accept it, on the ground that he was advised that he could neither make a title nor safely accept payment in Confederate currency. It was admitted, on the hearing below, that said money was tendered at that date, in such currency; that the parties through whom a good title could be made lived in New York; and that, after Bee's refusal to accept the notes tendered, Bissell used them for other purposes.

It does not appear by the pleadings, the evidence, or the agreed statement of facts on file, whether Henry Heyward, Jr., who was living when the bill was filed, and had then attained the age of twenty-one years, is now living. There is neither allegation nor proof of his death.

The court decreed that Bissell should perform his contract of purchase, and pay, in United States currency, a sum equal to the value of $100,000 in Confederate currency on June 18, 1863, the day of sale, with interest thereon until Feb. 11, 1864; from and after which day he should pay interest only on such a sum as was the value of $100,000 on said 18th of June, less its value on said 11th of February; said values and interest to be ascertained by the clerk of the court to whom the cause was referred, as master, to state and report the same: that upon Bissell's making the payment as stated and reported, that the clerk, "as master to said William C. Bee, executor of William

C. Heyward," convey the premises in fee-simple; but that, upon his failure so to pay, the master should sell the property, at public auction, for cash.

Said Henry Heyward died before the execution of the decree. On Nov. 23, 1874, Zefa Heyward, his wife, Zefita Heyward, his daughter, and Frank Heyward, his son, filed their bill of revivor, reciting the original bill, the proceedings thereunder, the reference to the master, the death of said Henry, — leaving a last will and testament, which was duly proved before the surrogate of the county of New York, — their appointment to execute the same, and that said Zefa alone took upon herself the execution thereof, and qualified accordingly, and praying that the bill might be revived. This bill was duly served; no answer was made, and an order of revivor was entered accordingly.

The master subsequently reported that the balance found by him to be due upon the contract was $28,353.50; and that, in reaching that result, he compared the value of the Confederate currency, in which the contract was payable, with United States paper currency at the date of the contract and of the tender. He found that, on the 18th of June, 1863, $1 in United States currency was worth $5.20 in Confederate currency; and that on the 14th of February, 1864, the value was $1 to $13.01. The court confirmed the report, Dec. 15, 1874; and decreed that the interlocutory decree previously rendered be carried into execution. Bissell thereupon appealed to this court, Bee declining to join in the appeal.

*Mr. William A. Maury* for the appellant.

When a vendor of real estate dies before he has received the purchase-money and made a conveyance, the bill against the vendee to enforce his specific performance of the contract must be filed by the personal representative of the vendor. Dart, Vendors, 468; Story, Eq. Pl., sects. 160–177.

Heyward, the original complainant, was but a life-tenant. The two contingencies on which the remainder to his son depended had not both happened; for, although the son had attained his majority, the other condition, of his surviving his father, had not happened at the filing of the bill. Nor had the executor then any estate. His remainder, as trustee to preserve

the contingent remainders, was itself still contingent; for Henry Heyward's life-estate was not spent, and if his son should survive his father, and so his estate become vested, there would no longer be any call for a trustee to preserve remainders. It comes to this, then, that the fee had descended to the testator's heir-at-law. 1 Fearne, pp. 353–355. The bill does not aver who is that heir, so that (according to the case thereby made) the fee is not represented. Again, the will, by the testator's sale to Bissell, was in equity revoked; and, although it has still operation at law, those taking, as devisees, the title of the estate sold, would be held by equity as trustees for the purchaser. It is apparent, therefore, that Henry Heyward had no beneficial interest whatever in or touching the lands when he filed the bill; and his representatives, in whose name the suit was revived, had no interest. His will is not in evidence, and it is impossible to say what was the character of that instrument. Besides, the bill of revivor avers that Zefa Heyward alone qualified as executrix.

Henry Heyward being now dead, his son, Henry Heyward, Jr., — who, according to the bill, was of age, — is, if alive, seised of the fee; but he is not a party to this suit. It would seem, then, that the bill is fatally defective as to parties.

There is a total failure by the original complainant to show a performance of the contract by the tender of a conveyance by the representatives of the vendor. *Prothro* v. *Smith*, 6 Rich. (S. C.) Eq. 324.

The value of United States currency between the dates when $20,000 was paid and the balance of the purchase-money tendered was variable and fluctuating; and gold coin was the only proper standard by which to measure the value of Confederate notes, in which the contract was solvable. They were, as declared in *Planters' Bank* v. *Union Bank* (16 Wall. 502), "a commodity, not money;" and the tender of them, with no other objection on the part of the creditor than that he could neither safely accept them nor make a good title, discharged the debt. 2 Pars. Contr., pp. 163–165. At the utmost, Bissell, after making the tender, was only liable to the estate as a bailee of the notes, and the whole function of the court was limited to determining what that liability was.

*Mr. Edward McCrady, contra.*

It is settled in South Carolina, that, where, after a devise, land has been sold by the testator, the devisee takes the estate in trust for the purchaser, and is the proper party to convey. *Rose* v. *Drayton*, 4 Rich. (S. C.) Eq. 260. In the present case, there was no devise in fee directly to any one. There was a devise for life, and the appointment of a trustee to preserve the contingent remainders limited after the determination of that estate. Under these circumstances, the safest mode of conveying was through the instrumentality of a court of equity. This bill was therefore filed, as Bissell then held and still holds possession; claiming the lands under his contract, and only raising the question as to what was due thereon. His taking possession thereunder must be regarded as a waiver of objection to the title of William C. Heyward. No question is, however, made as to that title; and Henry Heyward's allegation in the original bill, that his feoffment, with livery of seisin, and a release by Bee, would have absolutely transferred that title; and that he offered so to transfer it to Bissell is not denied in the answer. There has been, therefore, no default whatever on the part of the vendor or his representatives.

The notes of the Confederate States must be considered in the same light as if they had been issued by a foreign government temporarily occupying a part of the territory of the United States, and their value was properly scaled to that of the legal-tender notes of the United States. *Dooley* v. *Smith*, 13 Wall. 604; *Thorington* v. *Smith*, 8 id. 1.

The tender in February, 1864, relied on by the appellant to discharge the debt, was not kept good after that date; and did not, therefore, even discharge interest and costs. *Giles* v. *Hart*, 3 Salk. 343; *Sweatland* v. *Squires*, 2 id. 623.

MR. JUSTICE HUNT, after stating the case, delivered the opinion of the court.

It is objected that there is a fatal defect of parties complainant. The point of this objection is that Henry Heyward and William C. Bee were not able together to make a title that ought to be satisfactory to Bissell, and hence that the decree should be reversed.

The will of William C. Heyward took effect only upon his death. Until the occurrence of that event, the devisees therein named had no more title to or interest in the property in question than if their names had not been mentioned in the will. If he had consummated his contract with Bissell by executing a deed of the property, this would have worked an absolute revocation of the devise as to this property. The execution of the contract (with the partial payment thereon) was a transfer in equity of the title of the land to Bissell; leaving in the representatives of William C. Heyward simply a naked title as trustee for Bissell, to be conveyed upon performance on his part. By the terms of the will, this legal title was vested in William C. Bee, the trustee to preserve remainders.

Henry Heyward was tenant for life, and as such offered to convey to Bissell, " by feoffment, and livery of seisin, and to procure the release of right of entry and action by William C. Bee, the remainder-man for preserving contingent remainders; " and he avers in his bill that this would have made a good and effectual conveyance of the legal estate.

Bee held the legal title under the will, and his title to the legal estate continued in force as long as the remainders were contingent; and there is nothing in any part of the record showing that such was not the condition of the title when Heyward offered to convey, and that it is not so at the present time.

Chancellor Kent says (Com., vol. iv. p. 256), " The trustees are entitled to a right of entry in case of a wrongful alienation by the tenant for life, or whenever his estate for life determines in his lifetime by any other means. The trustees are under the cognizance of a court of equity, and it will control their acts, and punish them for a breach of trust; and if the feoffment be made by the purchaser with notice of the trust, as was the fact in *Chudleigh's Case,* a court of chancery will hold the lands still subject to the former trust. But this interference of equity is regulated by the circumstances and justice of the particular case. The court may, in its discretion, forbear to interfere; or it may and will allow, or even compel, the trustees to join in a sale to destroy the contingent remainder, if it should appear that such a measure would answer the

uses originally intended by the settlement." To this he cites many authorities.

We think this objection is not well taken.

Was there error in the amount decreed to be paid?

One of the statements of fact in the case sets forth that Bissell tendered the money; and fails to state that he deposited it, or in any manner set it apart or appropriated it for the purpose of the tender. The other states that he used the money he had thus provided. The legal effect is the same. To have the effect of stopping interest or costs, a tender must be kept good; and it ceases to have that effect when the money is used by the debtor for other purposes. *Roosevelt* v. *The Bull's Head Bank*, 45 Barb. (N. Y.) 579; *Giles* v. *Hart*, 3 Salk. 343; *Sweatland* v. *Squire*, 2 id. 623.

The defendant insists that the value of the Confederate notes should be reduced to gold or sterling exchange, which would still farther depreciate their value.

This objection cannot be sustained. By the laws of the United States, all contracts between individuals could then be lawfully discharged in the legal-tender notes of the United States. These notes, and not gold or sterling exchange, were the standard of value to which other currencies are to be reduced to ascertain their value. *Knox* v. *Lee*, 12 Wall. 457; *Thorington* v. *Smith*, 8 id. 1; *Dooley* v. *Smith*, 13 id. 604; Rev. Stat. So. Car., p. 285.

Confederate notes, although without the authority of the United States, and, indeed, in hostility to it, formed the only currency of South Carolina at the date of the transactions in question. United States currency was unknown, except when found upon the person of the soldiers of the United States taken and held as prisoners.

Confederate notes can in no proper sense be treated as commodities merely. The contract in question was made payable in terms in dollars; but both parties agree in writing that Confederate-note dollars were intended. The $20,000 was paid in Confederate notes; and, when the defendant tendered his $100,000, he tendered it in Confederate notes as dollars, and he obtained them by selling sixty-three bales of cotton for Confederate dollars. *Stewart* v. *Salamon*, 94 U. S. 434.

*Decree affirmed.*