## Rives v. Duke.

On the 5th of December, 1863, after the Proclamation of Emancipation, and in that part of Virginia the people of which were in rebellion against the United States, one resident therein sold and delivered to another a number of slaves, with warranty of title, but not of soundness, the purchaser covenanting " to pay on delivery the sum of $25,000 in bankable Confederate currency, and, in addition, to give his note," with two persons named as sureties, " for the further sum of $20,000, to be paid in twelve months after call, in equal annual payments thereafter, or at the purchaser's option it may be, on call, all or a part paid ; " and the seller covenanting " not to call upon the purchaser for specie when it is at a premium, but engaging on his part to be satisfied with the bankable currency of the day, on the stipulation to choose his own time for the call." On the 1st of January, 1864, the purchaser, in lieu of the note, made to the seller two bonds, with the same persons as sureties, to pay $8,000 " on demand, or twelve months thereafter, at the option of the obligors," and $12,000 " on demand, or two years thereafter, at the option of the obligors," " in the bankable currency of the day, according to the agreement of the 5th of December last," " the said demand shall be made in writing by the obligee, his heirs or legal representatives only." Payment of the bonds was demanded in writing by the obligee after the end of the war of the rebellion, and when the bankable currency of Virginia consisted wholly of notes of the United States or of the national banks. *Held*, in an action on the bonds, that the plaintiff had no ground of exception, 1, to the admission of evidence that, at the time when the agreement and bonds were made, Confederate currency was bankable and was the only currency in circulation in Virginia, the value of gold in relation to such currency was as nineteen or twenty to one, slaves were not selling at all for gold, and these slaves were not worth in Confederate currency so much as $45,000, and that before the war, when the price of slaves was at its highest, such a lot of slaves would not have been worth more than a fifth of that sum in gold; 2, to an instruc-

tion to the jury that, if they found that the bonds were made in reference to Confederate currency, the plaintiff was entitled to recover the amount, therein stipulated to be paid, at the value of Confederate money compared with national currency at the time of the making of the bonds.

ERROR to the Circuit Court of the United States for the Western District of Virginia.

This was an action of covenant, brought by the executor of the will, and prosecuted by the administrator *de bonis non* of George Rives, against Duke, the administrator of the estate of William P. Farish, a surety on two bonds.

The declaration alleged that on the 5th of December, 1863, in the county of Albemarle and State of Virginia, George Rives and George L. Peyton executed an agreement under seal, which began with a "list of servants sold to George L. Peyton" (giving the names and ages of thirty-three negroes, the oldest of whom were fifty-one years of age, and the youngest were infants), and the rest of which was as follows: "I have this day contracted to sell and deliver on the place, on the 1st of January next, to George L. Peyton the above list of negroes, thirty-three in number. The title thereto I warrant, but make no warranty of soundness. For the same negroes the said George L. Peyton agrees to pay on delivery the sum of twenty-five thousand dollars in bankable Confederate currency, and in addition to give his note, with William P. Farish and William H. Peyton as sureties, for the further sum of twenty thousand dollars, to be paid in twelve months after call, in equal annual payments thereafter, or at said Peyton's option it may be, on call, all or a part paid. The said George Rives covenants he will not call on said Peyton for specie when it is at a premium, but engaging on his part to be satisfied with the bankable currency of the day, on the stipulation to choose his own time for the call. The said postponed payment to carry interest from 1st January next, and to be annually paid at Monticello Bank. The said George Rives farther engages to furnish said Peyton one hundred barrels of corn at $20 per barrel, to be delivered on the place as soon as gathered, and the money therefor to be paid down in Confederate bankable currency. In witness whereof, and mutual obligation to perform our respective engagements, we

this day, 5th of December, 1863, have signed our hands and seals." ·

The declaration then alleged that on the 1st of January, 1864, in pursuance of that agreement, Rives delivered the negroes to Peyton on the farm in Albemarle on which Rives then resided, which was " the place " referred to in the agreement, and also delivered the one hundred barrels of corn ; and Peyton paid to Rives in bankable Confederate currency $25,000 in part payment of the purchase-money contracted to be paid for the slaves, and gave to Rives his two bonds, executed by William P. Farish and William H. Peyton as sureties, amounting in the aggregate to $20,000, the first of which bonds was in these terms : " On demand, or twelve months thereafter, at the option of the obligors, we promise to pay in the bankable currency of the day (according to agreement of the 5th December last), to George Rives, his heirs or assigns, eight thousand dollars with interest from date, to be annually paid on 1st January at Monticello Bank, Charlottesville ; the same being in part of the purchase-money for thirty-three negroes, the title whereof is warranted, but no warranty is made of soundness. The said demand shall be made in writing by said George Rives, his assigns or legal representatives only. In witness whereof, we have hereto put our hands and seals this first day of January, 1864 ; " and the other bond was precisely like the first, except in substituting the words " two years " for " twelve months," and " twelve thousand " for " eight thousand ; " and that these bonds were delivered and accepted as a compliance on the part of Peyton with the provision in the previous agreement to give his note for $20,000.

The declaration further alleged that in August, 1866, before the institution of this suit, Rives demanded in writing of the obligors payment of the principal and arrears of interest of the bonds ; and that, with the exception of the interest for one year, which fell due on the 1st of January, 1865, and which was paid, no part of the principal or interest had been paid.

The defendant demurred generally to the declaration, and pleaded covenants performed and covenants not broken, and twenty-five special pleas, which set forth at length, and in various forms, that the bonds were executed in consideration

· of part of the price of thirty-three negroes which Rives agreed. to sell and did sell and deliver to Peyton, with warranty of title as slaves, after the Proclamation of Emancipation issued by the President of the United States on the 1st of January, 1863, and from that date until after the sale and delivery of the negroes both Rives and Peyton were participants in the then existing rebellion against the United States, and they and the negroes were residents of Albemarle County in the State of Virginia, which were designated in the proclamation among the States and parts of States the people of which were in rebellion against the United States, and the negroes were there held as slaves, and were by the proclamation ordered and declared to be thenceforward free, and therefore, at the time of the contract, sale, and delivery, were free persons; that before the demand of payment, or the institution of this suit, and by action of the sovereign authority and government of the United States and of the State of Virginia, and by the amendments of the Constitutions of the United States and of the State of Virginia, slavery in Virginia had been abolished, and these negroes had been made, recognized, and declared to be free persons; that afterwards Peyton, in pursuance of the proclamation, was, by the authority and power of the executive government of the United States, including the military and naval authorities thereof, wholly deprived of these negroes; that by reason of the premises the warranty of title was broken, and the consideration of the bonds failed; that the contract, sale, and delivery were in direct contravention of the policy of the government of the United States, as manifested by the proclamation, and it had become unlawful to make or to enforce in the courts of the United States, or of the State of Virginia, any contract of the plaintiff's testator whereby these negroes had been or were treated or dealt with otherwise than as free persons; that the plaintiff's testator, being one of the persons included in the offer of amnesty and pardon contained in the proclamations of the President of the 8th of December, 1863, and the 29th of May, 1865, had accepted the same upon the terms and conditions therein set forth, and had taken the oaths therein prescribed, and had also received from the President a special pardon upon the

same conditions; and that upon each of these grounds the plaintiff could not maintain this action.

The defendant also filed a notice "that on the trial of this cause he will insist upon his right to have the bonds sued upon scaled according to the provisions of chapter 138 of the Code of Virginia (edition of 1873) as bonds which were either, according to the true understanding and agreement of the parties, to be fulfilled or performed in Confederate State treasury notes, or were entered into with reference to such notes as a standard of value.".

The plaintiff joined issue on the first and second pleas, and demurred to the twenty-five special pleas. The court overruled the demurrer to the declaration, and sustained the demurrers to the special pleas.

At the trial of the issues of fact the plaintiff introduced evidence tending to prove the allegations of the declaration, and that at and ever since the date of the demand in writing, in August, 1866, the bankable currency of Virginia consisted wholly of United States notes commonly called greenbacks and of national bank notes, which have always been of about equal value in their relations to gold.

The defendant offered evidence tending to prove the following facts: "1. That Confederate currency was the only currency in circulation in Virginia in December, 1863, or January, 1864. 2. That in December, 1863, the value of gold in relation to such currency was as 20 to 1, and in January, 1864, as 19 to 1. 3. That of the thirty-three slaves sold by George Rives to George L. Peyton, one woman and her two children were scrofulous, and another woman a cripple; and that in December, 1863, and January, 1864, the said thirty-three slaves were not worth in Richmond, Virginia, in Confederate currency, as much as $45,000; and that they were worth less in Albemarle, where they were sold, than in Richmond. 4. That such a lot of slaves, before the late war, even when the price of slaves was at its highest, would not have been worth more than $8,000 or $9,000. 5. That in December, 1863 and in January, 1864, all Confederate currency in circulation was bankable. 6. That as early as the fall of 1863 there was a general expectation among the people of Virginia that the Confede-

rate Congress would adopt measures to reduce the volume of
Confederate money, and that the value of such money would be
thereby much increased; 7. That in point of fact the Confede-
rate Congress, in February, 1864, did pass a law taxing to the
extent of 33⅓ per cent all Confederate currency which should
not be invested in 4 per cent Confederate bonds, on or before
the 1st of April, 1864; the effect of which law was to depreciate
still further the value of Confederate currency then in circula-
tion; and that after the 1st of April, 1864, the Confederate
money issued prior thereto ceased to be bankable.    8. That in
December, 1863, and January, 1864, slaves were not being sold
at all for gold.    9. That about the same time Tucker Coles, of
Albemarle, living five or six miles from George Rives, owned
about two hundred slaves, mechanics and field hands, and ave-
raging in value better than the slaves of George Rives; that he
tried to sell a large number of said slaves at $50 a head, in gold,
but could not; and that he would have sold them at $30 a head,
in gold, had it been offered to him.    10. That all of the slaves
purchased of George Rives by George L. Peyton perished as
property on his hands at the close of the war.    11. That in
August, 1866, the premium on gold as compared with national
currency was 49 per cent; in August, 1867, it was 41 per cent;
and in August, 1868, 45 per cent; and that at this time such
premium is only ½ of 1 per cent."

To the introduction of each and every part of this evidence
the plaintiff objected, and moved the court to exclude the
same: "1st, Because the contract sued upon is in writing, and
its meaning free from ambiguity, obscurity, or uncertainty of
any kind, and cannot therefore be explained, added to, or in
any manner varied by parol evidence.    2d, Because the evi-
dence offered does not come within the scope or meaning of the
statute of Virginia in reference to Confederate contracts, which
was intended to apply only to contracts for the payment of
dollars in general, and not to those in which the kind of dollars
is specifically expressed, or becomes certain by some event or
contingency mentioned in the contract.    3d, Because if, accord-
ing to the true interpretation of the Virginia statute just re-
ferred to, it makes parol testimony admissible to explain, add
to, or in any manner vary a contract in writing entered into

prior to its enactment, and which is in no way ambiguous or uncertain, then the statute is a violation of the Federal Constitution, because it not only impairs but destroys the obligation of the contract, making a new one in its stead. 4th, Because the evidence is irrelevant, since if all the facts which it legitimately tends to prove were admitted they would show no defence."

But the court overruled the plaintiff's objections, and admitted the evidence, and to the ruling admitting it the plaintiff excepted.

The plaintiff asked the court to instruct the jury as follows: " *First,* If they find that the contract in writing between George Rives and George L. Peyton, dated the 5th of December, 1863, and given in evidence by the plaintiff, is the contract referred to in the bonds sued on, then the contract and bonds are to be construed together, and, so construed, they import in themselves, not a contract to be paid absolutely in Confederate money, or any other specific currency, but a contract of hazard, that is to say, a contract payable in whatever currency should be bankable at the respective dates when the obligors were bound to pay said bonds, that is to say, on the 30th of August, 1867, as to the smaller bond, and the 30th of August, 1868, as to the larger bond. *Second,* If the jury find that the contract of the 5th of December, 1863, and two bonds of the 1st of January, 1864, given in evidence by the plaintiff, contain the true understanding and agreement of the parties as to the currency in which said bonds were to be paid; that more than two years before the institution of this suit George Rives demanded payment of said bonds of each of the obligors therein, and in the mode agreed upon; that at the time of said demand, and ever since, bankable currency in Charlottesville and throughout Virginia consisted wholly of national bank notes and greenback notes of the United States government, and that these have always been equal in their relation to gold, — then the jury must find for the plaintiff the face amount of the bonds, less the one year's interest credited thereon. *Third,* there is no evidence in the case to warrant the jury in finding that there was any other agreement or understanding between the parties, as to the kind of currency in which the bonds were

to be paid, than that which is contained in the written contract
and bonds themselves."

But the court refused to give the instructions requested, or
either of them, and instructed the jury as follows: "If the jury
find from the evidence that George Rives and George L. Pey-
ton, on the 5th of December, 1863, entered into the agreement
offered in evidence, and in pursuance thereof, and in accord-
ance with its terms, Rives delivered the negroes to Peyton, and
the bonds sued on were given, on which the defendant's in-
testate was surety, then the plaintiff is entitled to recover the
amount stipulated to be paid in said writings obligatory in the
currency of the United States at its value at the time the same
fell due according to their tenor and effect, unless the jury find,
from the evidence in the cause, that the said writings oblig-
atory were at the time made and understood by the parties
thereto to be made payable in Confederate money.  And if
the jury find from the evidence that the said bonds or writings
obligatory were made in reference to Confederate currency,
then the plaintiff is entitled to recover the amount stipulated
to be paid in such bonds, at the value of Confederate money
compared with national currency at the time of the making
thereof, with interest from the time said bonds according to
their tenor and effect became payable.  But if the jury find
from the evidence that the bonds and contract offered in evi-
dence were made in view of the uncertainty of the value of the
then or future bankable currency of the place of payment, and
that each party, in entering into the contract, took the risk of
what money should be current at the time for payment of said
bonds according to the tenor and effect thereof, then the plain-
tiff, if the jury find that the parties executed the contract
offered in evidence, and the bonds offered in proof in pursu-
ance thereof, is entitled to recover the sum nominated in said
bonds in national currency at the time the same became due,
with interest thereon."

The plaintiff excepted to the refusal to give the instructions
requested, and to the instructions given, upon the same grounds
on which he had objected to the admission of the evidence
offered by the defendant.

The jury, by their verdict, "find for the plaintiff on the

issues joined, and assess his damages at $1,000, with in-
terest at the rate of six per cent per annum from the 1st of
January, 1865, till paid, that being the scaled value as of the
1st of January, 1864, of the nominal amount of the bonds
sued on, less the one year's interest thereon;" and the court
gave judgment for the plaintiff accordingly.   He thereupon
sued out the writ of error.

*Mr. E. R. Watson* and *Mr. William W. Crump* for the plain-
tiff in error.

*Mr. S. V. Southall* and *Mr. William J. Robertson* for the
defendant in error.

MR. JUSTICE GRAY delivered the opinion of the court.

It is settled by the decisions of this court that a contract,
made within the so-called Confederate States during the war of
the rebellion, to pay a certain sum in dollars, without specify-
ing the kind of currency in which it was to be paid, may be
shown, by the nature of the transaction and the attendant cir-
cumstances, as well as by the language of the contract itself,
to have contemplated payment in Confederate currency; and
that if that fact is shown, in an action upon the contract, no
more can be recovered than the value of that currency in lawful
money of the United States.   *Thorington* v. *Smith*, 8 Wall. 1;
*The Confederate Note Case*, 19 id. 548, 559; *Wilmington &
Weldon Railroad Co.* v. *King*, 91 U. S. 3.

By the bonds in suit the obligors promise to pay "on de-
mand, or" (in the first bond) "twelve months," and (in the
second bond) "two years thereafter, at the option of the ob-
ligors," eight thousand and twelve thousand dollars respec-
tively, "in the bankable currency of the day, according to the
agreement of the 5th December last."   In the agreement so
referred to, which is a contract for the sale of slaves, that part
of the price which is to be paid on the delivery is clearly
expressed to be "the sum of twenty-five thousand dollars in
bankable Confederate currency;" and the agreement, upon its
face, affords strong ground for inferring that "the further
sum of twenty thousand dollars to be paid in twelve months
after call," and as to which the seller covenants not to call for
specie, but to be satisfied with the "bankable currency of the

day," is also to be paid in Confederate currency, and that the effect of this clause is not varied by the omission to repeat therein the word " Confederate," the use of which, in the previous as well as in the subsequent part of the agreement, shows the kind of bankable currency which the parties to the agreement, and to the bonds that refer to it, had in mind. And a consideration of the nature of the agreement, and of the circumstances under which it was made, removes all doubt upon the subject.

It was a contract for the sale and purchase of slaves, made and to be performed in, between parties residing in, that part of the State of Virginia from which the authority of the national government was excluded by the rebel armies, and was made after the Proclamation of Emancipation issued by the President of the United States had declared all slaves in that district to be free. If the so-called Confederate States should achieve independence, the money of the United States would be the money of a foreign country. If the national authority should be re-established over the insurgent districts, the slaves, for part of the price of which the payment was to be made, would be free, in fact and in law, and be wholly lost to the purchaser. In view of either alternative, the parties cannot reasonably be held to have contemplated payment in any other currency than that of the Confederate States.

That part of the evidence introduced by the defendant, of the competency of which, in the light of the decisions in *Thorington* v. *Smith* and in *The Confederate Note Case*, above cited, there can be no question, leads to the same conclusion. It tended to prove that, at the time and place of the making of the agreement and of the bonds, the only currency in circulation or bankable was Confederate currency, the value of that currency in relation to gold was as one to nineteen or twenty, slaves were not being sold at all for gold, and the slaves were not worth more than the stipulated price computed in Confederate currency, and would never, even before the war, have been worth more than a fifth of that price in gold.

The competency of the evidence as to the popular expectation of an increase in the value of Confederate currency, and

as to the price at which another person would or could have sold other slaves, is much more doubtful, and need not be considered, inasmuch as it was not specifically contested at the argument, probably because its exclusion could not vary the result, so long as the evidence which we hold to be competent is admitted.

The facts of the case clearly distinguish it from *Gavinzel* v. *Crump* (22 Wall. 308), and bring it within that class of cases in which the Court of Appeals of Virginia has held contracts made during the war to be payable in Confederate currency only. See *M'Clung* v. *Ervin*, *Hilb* v. *Peyton*, *Bowman* v. *McChesney*, and *Calbreath* v. *Virginia Porcelain Co.*, 22 Gratt. (Va.), 519, 550, 609, 697.

For these reasons, we are all of opinion that the parties to the bonds in suit contemplated payment in Confederate currency; and it is immaterial to consider whether, by reason of the option given to the seller in the original agreement, and to the obligors in the subsequent bonds, the value of that currency should be estimated as of the date of the bonds, or as of the date of the demand of payment, because the earlier estimate, upon which the instructions of the court and the verdict of the jury proceeded, is the more favorable to the plaintiff.

As no error prejudicial to the plaintiff is shown in the rulings and instructions of the court, and as the defendant has not and could not have brought a writ of error, it would be extra-judicial to pass upon the further position of the defendant, that the bonds sued on have no legal validity or effect.

*Judgment affirmed.*