IN RE FRANCIS KETCHUM.

January Term, 1918.

Present: WATSON, C. J., HASELTON, POWERS, TAYLOR, and MILES, JJ.

Opinion filed February 25, 1918.

*New Trial—Disqualification of Juror.*

After conviction of respondent of murder in the first degree, it appeared that one who had served as a juryman at the trial had, soon after

the shooting, gone to the place where the dead body was found, as an undertaker's assistant, and had helped in removing the body to the undertaking rooms, and thus had had opportunity of observing the position of the body and its appearance, height and weight, all of which matters were issues on trial. On petition for new trial *held*, the verdict should be set aside and a new trial granted.

Every petition for a new trial brought conformably to law must fail or prevail according to the strength of its appeal to the judgment and conscience of the Court.

PETITION for new trial, heard at the February Term, 1918, of Supreme Court, on petition, and affidavits in support thereof. Petitioner was convicted of the crime of murder in the first degree at the June Term, 1917, Bennington County. The opinion states the case.

*Collins M. Graves* for petitioner.

*Herbert G. Barber*, Attorney General, and *Frank S. Archibald*, State's Attorney, for the State.

HASELTON, J.   Francis Ketchum, the petitioner, was at the June Term, 1917, of the Bennington county court, convicted of the crime of murder in the first degree and the sentence of the law was duly imposed. That sentence provides that the petitioner be put to death by electrocution during the week of Monday next after the first day of March, 1918. The formal sentence need not be recited here. The trial was conducted by the court with eminent fairness, as the official transcript shows, and the respondent therein, the petitioner here, brought no bill of exceptions to this Court. One of the defences on trial was that of insanity, of which the State was given notice some months before the trial. On trial that was the principal defence, though the question of whether, if the petitioner was guilty of a felonious homicide, he was guilty of manslaughter, of murder in the second degree or murder in the first degree was necessarily in the case and was carefully treated by the court in its charge to the jury. The evidence, too, was such that the court felt called upon to charge upon the doctrine of self-defence. At the January Term, 1918, of this Court, this petition was heard on the sole ground

that it originally set up, that of newly discovered evidence of insanity on the part of the petitioner. A few days after the adjournment of the January Term, the petition was amended so that it set up as a further ground for a new trial facts and circumstances newly discovered relating to the fitness of one of the jurymen, F. H. Ferguson, to sit in the trial of the cause. No question is made or can be made that the facts and circumstances relied on in the amendment to the petition were unknown to the petitioner and his counsel, and also to the representatives of the State, until after the trial; nor was the failure to learn of these facts and circumstances, before they were brought to light, due to any lack of diligence on either side.

The conviction of the petitioner was for the murder of one William Costello, September 16, 1916. In the evening of that day, at a place near the grounds of the Soldiers' Home, where the track of a trolley car line crosses a highway, the dead body of Costello was found. On the trial facts and circumstances as to its condition, location and appearance were testified to, with very considerable particularity, by various witnesses called by the State. After the introduction of the evidence as to such and other facts and circumstances the State introduced evidence of two oral confessions made by the petitioner, in both of which he confessed that he shot and killed Costello on the evening in question at the place where the body of Costello was found. On trial the petitioner took the witness stand in his own behalf and admitted the shooting and killing.

Before making further reference to the evidence we may here logically point out the situation in which the juryman Ferguson stood with reference to his ability to try each and every issue in the case solely upon the evidence given in open court. In his examination on the *voir dire* the juryman gave apparently fair answers to the precise questions put to him, taking such questions in a strictly literal sense. Those questions elicited nothing more with regard to his knowledge of the crime alleged, or any matter connected with it, than that a few days after the crime was committed he heard it talked about on the street, and, as he presumed, participated in conversation so had and may, possibly, have heard persons in such conversation attempt to go into the details as they were alleged to have happened, had, as he presumed, read whatever account appeared in the *Bennington Banner* at the time. His statements on the *voir dire* suggested

no reason whatever why he was not in every way a person qualified to sit with propriety in the trial of the case.

We turn now to the affidavits relating to the amendment to the petition for a new trial.

Roy Paddock of Bennington deposed that he is by occupation an undertaker, and that the juryman, Ferguson, occasionally assists him. He goes on to say that he remembers the night, in September, 1916, when William Costello was shot, that he received word to go to the place of the shooting, that he immediately called Mr. Ferguson by telephone, met him at the Walbridge undertaking rooms and drove in an ambulance with Mr. Ferguson and one Charles Percey to the scene of the shooting. Continuing the deponent says: "Said Ferguson and I left the ambulance, taking with us a stretcher, and went to the place where the body of Costello was lying on the ground. We remained there a few minutes, then placed the body upon a stretcher, and to the best of my recollection Ferguson, Percey, police officer Hurley and I carried Costello's body on the stretcher to the ambulance. Said Ferguson, Percey and I then drove to the Walbridge undertaking rooms and we then placed said body in said rooms. Ferguson and I remained for about one-half hour in and about the room where said body lay, although I cannot recall the exact length of time Ferguson remained in the rooms after the body was brought in."

As the deponent Paddock was a witness in the case, and we shall have occasion to refer to his testimony, we note here that in his affidavit, he further says that at the trial he saw Ferguson sitting as one of the jurors.

Charles Percey, referred to in the foregoing affidavit, makes an affidavit in which, referring to the night in which Costello was shot, he deposes as follows: "I received word from F. H. Ferguson of said Bennington that Roy Paddock wished me to accompany him to the place of the shooting. Said Ferguson, Paddock and I drove in an ambulance to the scene of the shooting, remained there for several minutes. I then assisted the said Ferguson, Paddock and police officer Hurley in taking Costello's body from the ground and carrying it on a stretcher to the ambulance. Said Ferguson, Paddock and I then drove in the ambulance to the Walbridge undertaking rooms and put the body in said rooms."

The juryman Ferguson makes a counter affidavit so called, in which he deposes as follows: "That I did assist the undertaker in removing the body of William Costello from the place where he is alleged to have been killed, in September, 1916, to the undertaking rooms of J. Ed. Walbridge in said Bennington. That I went to the place at the request and in the company of Roy Paddock who was there in the employ of said Walbridge. That nothing was said by any person either while we were going to or from that place or while we were there as to how said Costello met his death; that no mention was made of the respondent or of any other person in connection with that matter; that there was no discussion concerning him, said Costello; that there was no examination of the ground or of surrounding objects; that it was late in the evening, not far from eleven o'clock, I should judge; that we merely removed the body and I then went away with said Paddock and heard nothing more of the case, excepting that it was claimed that Costello had been killed, until the evidence was submitted when the respondent was on trial."

The above, omitting the formal parts is the entire affidavit of the juryman. He says nothing as to what he in fact observed or did not observe about the body or the place where it was found. However, it is highly probable that he could not have failed to observe certain things or the absence of certain things to which considerable testimony related.

In his confessions out of court as testified to by witnesses, the petitioner said that after the shooting was over, Costello's body was lying on the ground on its side, and that he rolled the body over on its back to make sure that Costello was dead, and that Costello's face was covered with blood. In his testimony in court the petitioner said that he looked to see if Costello was dead but said nothing about turning the body over on its back. The testimony of William Powers, motorman on a trolley car, of Eugene Shea, a passenger on the same car, of Griffin, a policeman, of Chief of Police Brasel, and of Policeman Richard Hurley, taken together tended to show that from the time when the body was found until it was removed by juryman Ferguson and the others who took part in the removal, the body was lying on its back with a face smeared with blood. Roy Paddock, the undertaker, whom juryman Ferguson assisted in the removal of the body, was a witness for the State on the trial, and testified that

when they took up the body he noticed that there was blood on the ground covering, as he should say, quite a space. There was a good deal of evidence introduced by the State as to the position in which the body lay and the direction in which the head lay. The State evidently attached considerable importance to this evidence, and it had a bearing upon the story of the petitioner as to the manner of an encounter between him and Costello immediately preceding the shooting. Mr. Paddock, the undertaker, was able to answer closely such questions as were put to him regarding the position of the body. There was put in evidence by the State an estimate of the weight and a measurement of the height of Costello, and the petitioner gave an estimate of his own weight at the time of the shooting, making his own weight appreciably less than that of Costello.

This evidence was apparently thought to have some bearing upon a story which the petitioner told of an encounter with fists between him and Costello just before the shooting. Juror Ferguson, who helped carry the body of Costello from the ground to the ambulance and from the ambulance to the undertaking rooms, was probably able to make an estimate of the weight of Costello; and as to the testimony in that regard, and the other circumstances we have referred to as probably coming under his observation at the place where the body was found, the juror was in all reasonable probability able, to some extent, to test the accuracy and reliability of the witness by reference to his own observations. Of special importance is the fact that he must be taken to have had in mind some things which he had observed that enabled him, to some extent, to judge whether or not the story told by the petitioner related to doings at a time when the petitioner was free from delusions, illusions, hallucinations, and such other symptoms of insanity as were enumerated by a competent witness in the trial of this case.

We do not enlarge upon this matter, but we feel bound to note that the presence of Mr. Ferguson upon the jury obviously exerted a certain sinister influence as various witnesses gave their testimony. Mr. Paddock, who remembered so well that he drove with Mr. Ferguson and Mr. Percey from the undertaking rooms down to the place where the body was found to get the body, was asked while giving his testimony with regard to that drive: "With whom did you go down?" He answered: "With Percey," and made no mention of Mr. Ferguson. As he says in

his affidavit, he saw Ferguson sitting as a juryman in the trial of the case. Officer Hurley, who according to the affidavits of Paddock and Percey assisted them and Ferguson in carrying the body of Costello from the ground where it lay to the ambulance, testified to the taking of the body to the undertaker's rooms, and being asked: "Who carried it to the undertaker's?" replied: 'LeRoy Paddock with a driver." Hurley made no mention of Mr. Ferguson. Officer Griffin was the first officer at the scene of the tragedy, and as he testified, remained there until the body was put into the undertaker's wagon. Being asked: "The undertaker who came down was who?" he replied: "Mr. Paddock was one, I don't know the other." It is of course, possible that the witness did not know Mr. Ferguson, but as it is clear that Mr. Ferguson went down with Paddock and Percey, it is quite probable that in answering as he did, officer Griffin referred to Paddock and Percey, and felt warranted in not mentioning juryman Ferguson's name on the ground that the inquiry was as to who was the undertaker, whereas Ferguson was not strictly an undertaker though the undertaker sometimes called on him for assistance. However, this may be, the fact that certain witnesses, who naturally would have mentioned Ferguson's name in answer to inquiries put to them, did not do so points to a feeling on their part that he was in an embarrassing and improper position sitting as a juryman. No doubt they felt that, while omitting mention of his name, they were stating everything material to the matters inquired about.

In point of fact, however reliable and just a person Mr. Ferguson may be, he was not a fit person to sit in the trial of this case. If he was, a jury made up entirely of persons who gathered at the scene of the tragedy in the course of the evening of its enactment, while the body with its blood-smeared face was lying there on the bloody ground, each gathering some detail as to what had happened, would have been a fit and lawful jury. The thought of such a jury is abhorrent to the administration of justice.

It is to be remembered that we are not dealing with a case in which a respondent, about whose sanity no question is made, takes the witness stand and admits that he is guilty of the very crime of which he is convicted. The petitioner was convicted of the crime of murder in the first degree. What he admitted was that he committed homicide in the killing of William Cos-

tello.   Whether he was sane or insane, and whether, if, the kill-
ing was felonious, the petitioner was guilty of manslaughter, of
murder in the second degree, or of murder in the first degree, re-
mained for the jury to determine, under the law as given them,
on all the evidence in the case direct and circumstantial, and
upon nothing but the evidence given in open court in the pres-
ence of the respondent, the petitioner here.

Counsel for the State refer us to several cases in which
petitions for a new trial have been denied notwithstanding some
unfitness or impropriety on the part of jurymen.   But this case
is broadly distinguishable from any case cited and from any
well reasoned case that has come to our attention.   And it must
be said that every petition for a new trial, brought conform-
ably to law, must fail or prevail according to the strength of the
appeal which it makes to the judgment and conscience of the
Court.

We deem it inadvisable to consider that branch of the peti-
tion which asks for a new trial on the ground of newly discovered
evidence of insanity.   And, for obvious reasons, we have not
stated nor commented upon the trial any further than was
necessary to a demonstration that such trial was a mistrial.

*Petition granted, verdict, judgment and sentence set aside,
and new trial ordered.*