CATHERINE HALLORAN *v.* NEW ENGLAND TELEPHONE AND
TELEGRAPH COMPANY.

February Term, 1921.

Present: WATSON, C. J., POWERS, TAYLOR, MILES and SLACK, JJ.

Opinion filed October 4, 1921.

*Damages—Mental Anxiety and Distress—Supreme Court Bound
by the Record—Consideration of Impaired Purchasing
Power of Dollar in Assessing Damages—Defence not Pre-
sented at Trial not Ground for New Trial.*

1. Where plaintiff, at the time of an accident, was suffering from a
   disease which required a prompt surgical operation if a fatal
   result was to be averted, and the accident resulted in an in-
   curable disease of her heart, which precluded the operation,
   and she, through her physician, learned these facts, her mental
   anxiety and distress over the fact that the condition of her
   heart would not admit of an operation which would otherwise
   be an available cure was the proximate result of her physical
   injury sustained through defendant's negligence, and a proper
   element of recoverable damages.

2. The Court is bound by the record; and where it shows that the
   plaintiff was allowed an exception to a certain ruling, the de-
   fendant cannot show that this was a mistake, and that in fact
   the exception was allowed to the defendant.

3. Although there was no evidence in the case regarding the matter,
   the jury, in assessing the damages, was properly permitted to
   consider the then impaired purchasing power of the dollar,
   so far as the pecuniary losses of the plaintiff were concerned.

4. A new trial on the ground of newly discovered law constituting
   an absolute defence will not be granted where the petitioner
   knew of the principles of the law upon which the petition is
   based prior to the trial, and its failure to call the same to the

attention of its local counsel was without adequate justifica-
tion or excuse.

ACTION OF TORT for negligence. Plea, the general issue. Trial by jury at the March Term, 1920, Washington County, *Chase,* J., presiding. Verdict and judgment for the plaintiff. The defendant excepted. The opinion states the case.

*Shields & Conant* for the defendant.

*Theriault & Hunt* for the plaintiff.

POWERS, J. The plaintiff secured a verdict in an action predicated upon the defendant's negligence, and the latter seeks a reversal of the judgment rendered thereon. Only three of the exceptions saved at the trial are briefed by the defendant, and these only are considered.

[1] 1. The plaintiff's evidence tended to show that at and before the time of the accident, she was suffering from a malignant disease of a private nature, which required a prompt surgical operation if a fatal result was to be averted; that the accident had resulted in a serious and incurable organic disease of the heart, which precluded the operation referred to; that through her physician, she learned these facts; and that she suffered much mental anxiety and distress on account of the same. The defendant excepted to the admission of the evidence tending to show such mental anguish, and to its being allowed as an element of the plaintiff's damages.

As we have seen, the physical condition which required an operation existed at the time of the accident and was not caused by it; but the physical condition which made it impossible to perform the operation was a direct result of the accident. The mental distress which the plaintiff was allowed to show was not on account of the doctor's disclosure of her fatal malady, but from the knowledge that the condition of her heart would not admit of an operation which would otherwise be an available cure. This anxiety she would have been free from but for the accident. It was, then, a natural and proximate result of the physical injury sustained through the defendant's negligence, and a proper element of recoverable damages. *Rogers* v. *Bige-*

*low,* 90 Vt. 41, 96 Atl. 417; *Nichols* v. *Central Vermont Ry. Co.,* 94 Vt. 14, 109 Atl. 905, 12 A. L. R. 333.

It is under this rule that fear of hydrophobia (*Godeau* v. *Blood,* 52 Vt. 251, 36 A. L. R. 751), apprehension of insanity (*Walker* v. *Boston & Maine R. R.,* 71 N. H. 271, 51 Atl. 918), dread of blood poisoning (*Butts* v. *National Exchange Bank,* 99 Mo. App. 168, 72 S. W. 1083), fear of giving birth to a deformed child (*Prescott* v. *Robinson,* 74 N. H. 460, 69 Atl. 522, 17 L. R. A. [N. S.] 594, 124 A. S. R. 987), dread of death from swallowing glass (*Watson* v. *Augusta Brewing Co.,* 124 Ga. 121, 52 S. E. 152, 1 L. R. A. [N. S.] 1178, 110 A. S. R. 157), are admitted as proper elements of damage. It is to be observed that mere regret, disappointment, or vexation are not mental suffering within the meaning of the rule (*Bovee* v. *Danville,* 53 Vt. 183), but fear, worry, and apprehension are typical sorts of it. *Egan* v. *Middlesex, etc., R. Co.* (D. C.) 212 Fed. 562. And it is very properly held that the anxiety must be natural and not speculative (*Rogers* v. *Bigelow, supra*), real and not fanciful (*Watson* v. *Augusta Brewing Co., supra*).

[2] 2. In the course of his argument, counsel for the plaintiff called attention to the fact that none of the defendant's officers or servants had appeared as witnesses, the obvious purpose being to have the jury infer that, if produced, these persons would have given evidence unfavorable to the defendant. To this line of argument the defendant objected, and asked for an exception. The court ruled, in effect, that the argument was improper, saying, "I don't believe you better pursue that line of argument, and you may have an exception." The transcript, to which controlling reference is made, shows that an exception was allowed to the plaintiff. The defendant insists that this is a mistake, and that in fact the exception was allowed to the defendant; and it calls attention to certain circumstances indicating this. But we are bound by the plain terms of the record, and will not allow it to be falsified in this Court. Right or wrong, it is the sole and only basis for appellate action.

[3] 3. Counsel for the plaintiff was allowed to urge in argument, that in assessing the damages the jury should consider the present impaired purchasing power of the dollar; and the court instructed them that they might consider it. The defendant excepted. There is no claim that there was any evidence in the case regarding this matter.

The result sought by the law in assessing damages in such cases is compensation—the ascertainment of such a sum as will compensate the plaintiff—so far as a money payment can—for the injury. Necessarily, damages are to be expressed in terms of money. And while money is the standard of value by which the worth of all other property is to be measured, and while, in theory, its value remains constant and unfluctuating, and while it must be admitted that really it is prices which rise and fall amid changing economic conditions, yet, after all, in a very real and a practical sense money itself is a shifting standard, varying in value according to the changes in its purchasing power. As a medium of exchange, its value appreciates or depreciates according to the rise and fall in commodity prices. So it is that, at least so far as those elements of damages properly classed as pecuniary losses—like loss of time, loss of earning power, expenses and the like—are concerned, it is proper for the jury to take into consideration the fact, known to everybody, that the purchasing power of money is at present seriously impaired. And it is so held by the courts. *Washington, etc., R. Co.* v. *La-Fourcade,* 48 App. D. C. 364; *Louisville & N. R. Co.* v. *Scott's Admr.,* 188 Ky. 99, 220 S. W. 1066. The question has more often arisen in cases involving the question of excessive verdicts. But the principle is the same, and the decisions are in accord. *Noyes* v. *Des Moines Club,* 186 Ia. 378, 170 N. W. 461, 3 A. L. R. 605, and note; *Bowes* v. *Public Service R. Co.* (N. J.) 110 Atl. 699; *Melish* v. *New York Con. R. Co.,* 108 Misc. Rep. 291, 178 N. Y. Supp. 228; *Hance* v. *United Rys. Co. of St. Louis* (Mo. App.) 223 S. W. 123; *Duffy* v. *Kansas City Rys. Co.* (Mo. App.) 217 S. W. 883; *Hurst* v. *Chicago, B. & Q. R. Co.,* 280 Mo. 566, 219 S. W. 566, 10 A. L. R. 174, and note; *McCready* v. *Fournier* (Wash.) 194 Pac. 398; *Standard Oil Co.* v. *Titus,* 187 Ky. 560, 219 S. W. 1077; *Illinois Cent. R. Co.* v. *Johnston,* 205 Ala. 1, 87 So. 866. Whether any different rule should be applied to the elements of damage other than pecuniary losses, like physical suffering and mental distress, is a question neither raised nor considered.

*Judgment affirmed.*

WATSON, C. J., dissenting. I am unable to agree with the majority of my associates that there was no error in the ruling below, permitting counsel for plaintiff, when arguing to the jury

on the question of damages, to say to them to "consider the value of a dollar today, as compared with what it was." And in upholding the charge of the court to the same effect.

In law we are compelled to compensate for violated rights in money, and for this purpose to make pecuniary estimates of the value of their violations, the possession of money becomes a kind of legal *summum bonum.* Terry, Principles of Anglo-American Law, Sec. 126, p. 99. And since the only compensation which the law can compel is a compensation in money, it must be measured by something which will measure the pecuniary loss, and the measure to be applied must be real and a tangible one. 17 C. J. 166C; The A. A. Raven, 222 Fed. 958; 8 R. C. L. 431, § 8. Actual pecuniary compensation is the general rule, whether the action be in contract or in tort (except where exemplary damages are warranted). 8 R. C. L. 431, § 8. And damages which may be recovered for injuries resulting from the negligence of another are to be arrived at according to general rules of law, framed with reference to the just rights of both parties: Not merely what it may be right for the injured party to receive as just compensation for his injury, but also what it is just to compel the other party to pay. 8 R. C. L. 434, § 8; *Spade* v. *Lynn & B. R. Co.,* 168 Mass. 285, 47 N. E. 88, 60 A. S. R. 393, 38 L. R. A. 512; *Kline* v. *Kline,* 158 Ind. 602, 64 N. E. 9, 58 L. R. A. 397.

By the Constitution of the United States, the Congress shall have power "to coin money, regulate the value thereof, and of foreign coin, and fix the standard of weights and measures." And by the statute enacted by Congress, "The gold coins of the United States shall be a legal tender in all payments at their nominal value when not below the standard weight and limit of tolerance provided by law for the single piece, and, when reduced in weight below such standard and tolerance, shall be a legal tender at valuation in proportion to their actual weight." "The silver coins of the United States shall be a legal tender at their nominal value for an amount not exceeding five dollars in any one payment." See *Bronson* v. *Rodes,* 7 Wall. 229, 19 L. ed. 141. In the case *United States* v. *Marigold,* 9 How. 560, 13 L. ed. 257, the Federal Supreme Court, through Mr. Justice Daniel, said: "The power of coining money and of regulating its value was delegated to Congress by the Constitution for the very purpose, as assigned by the framers of that instrument, of creating and

preserving the uniformity and purity of such a standard of value; and on account of the impossibility which was foreseen of otherwise preventing the inequalities and the confusion necessarily incident to different views of policy, which in different communities would be brought to bear on this subject. The power to coin money being thus given to Congress, founded on public necessity, it must carry with it the correlative power or protecting the creature and object of that power.''

Acts were passed by Congress in 1862 and 1863, which made United States treasury notes a legal tender in payment of debts, public and private. The constitutionality of these acts being challenged, the question came before the Federal Supreme Court in the Legal Tender Cases (*Knox* v. *Lee*, and *Parker* v. *Davis*), 79 U. S. (12 Wall.) 457, 20 L. ed. 287. The majority opinion (delivered by Mr. Justice Strong) shows that those Acts were passed when the Civil War was raging, seriously threatening the overthrow of the government and the destruction of the Constitution itself; that the equipment and support of large armies and navies required the employment of money to an extent beyond the capacity of all ordinary sources of supply; that the public treasury was nearly empty, and the credit of the government nearly exhausted; that moneyed institutions had advanced so largely of their means, that they had been compelled to suspend specie payments. An immediate necessity was pressing. The amount then due the soldiers in the field was nearly a score of millions of dollars. The requisitions for supplies exceeded fifty millions, and the current daily expenditure was over one million. ''The entire amount of coin in the country, including that in private hands, as well as that in banking institutions, was insufficient to supply the need of the government for three months, had it all been poured into the treasury.'' Therein Mr. Justice Strong further said: ''The Constitution was intended to frame a government as distinguished from a league or compact, a government supreme in some particulars over states and people. It was designed to provide the same currency, having a uniform legal value in all the states. It was for this reason the power to coin money and regulate its value was conferred upon the Federal Government, while the same power as well as the power to emit bills of credit was withdrawn from the states. The states can no longer declare what shall be money, or regulate its value. Whatever power there is over the currency is vested in Congress.

* * * The Constitution does not ordain what metals may be coined, or prescribe that the legal value of the metals, when coined, shall correspond at all with their intrinsic value in the market. Nor does it even affirm that Congress may declare any thing to be a legal tender for the payment of debts. Confessedly the power to regulate the value of money coined, and of foreign coins, is not exhausted by the first regulation. More than once in our history has the regulation been changed without any denial of the power of Congress to change it, and it seems to have been left to Congress to determine alike what metal shall be coined, its purity, and how far its statutory value, as money, shall correspond from time to time, with the market value of the same metal as bullion. * * *

"But the obligation of a contract to pay money is to pay that which the law shall recognize as money when the payment is to be made. If there is anything settled by decision it is this, and we do not understand it to be controverted. * * * No one ever doubted that a debt of $1,000, contracted before 1834, could be paid by one hundred eagles coined after that year, though they contained no more gold than ninety-four eagles such as were coined when the contract was made, and this, not because of the intrinsic value of the coin, but because of its legal value. The eagles coined after 1834 were not money until they were authorized by law, and had they been coined before, without a law fixing their legal value, they could no more have paid a debt than uncoined bullion, or cotton, or wheat. Every contract for the payment of money, simply, is necessarily subject to the constitutional power of the government over the currency, whatever that power may be, and the obligation of the parties is therefore assumed with reference to that power * * *.

"We have been asked whether Congress can declare that a contract to deliver a quantity of grain may be satisfied by the tender of a less quantity. Undoubtedly not. But this is a false analogy. There is a wide distinction between a tender of quantities, or of specific articles, and a tender of legal values. Contracts for the delivery of specific articles belong exclusively to the domain of state legislation, while contracts for the payment of money are subject to the authority of Congress, at least so far as relates to the means of payment. They are engagements to pay with lawful money of the United States, and Congress is empowered to regulate that money."

Mr. Justice Bradley, writing a concurring opinion (same case) said: "The state governments are prohibited from making money or issuing bills. Uniformity of money was one of the objects of the Constitution. The coinage of money and regulation of its value is conferred upon the General Government exclusively. That Government has also the power to issue bills. It follows, as a matter of necessity, as a consequence of these various provisions, that it is specially the duty of the General Government to provide a national currency. The states cannot do it, except by the charter of local banks, and that remedy, if strictly legitimate and constitutional, is inadequate, fluctuating, uncertain, and insecure, and operates with all the partiality to local interests, which it was the very object of the Constitution to avoid. But regarded as a duty of the General Government, it is strictly in accordance with the spirit of the Constitution, as well as in line with the national necessities."

In an earlier case it was held that Congress having undertaken to provide a currency for the whole country, it could secure the benefit of it to the people by appropriate legislation; that to this end Congress could restrain, by suitable enactments, the circulation as money of any notes not issued under its own authority. *Veazie Bank* v. *Fenno,* 8 Wall. 533, 19 L. ed. 482. And for the undoubted purpose of destroying the use of such notes as money, Congress enacted in 1865: "Every national banking association, state bank, or banker, or association, shall pay a tax of ten per centum on the amount of notes of any town, city, or municipal corporation paid out by them." In *Merchants' National Bank* v. *United States,* 101 U. S. 1, 25 L. ed. 979, the action was brought by the United States to recover such a tax. It was held that, as against the United States, a state municipality has no right to put its notes in circulation as money; that such use is against the policy of the United States; and that Congress had the power to destroy such use. Much to the same effect is *Juilliard* v. *Greenman,* 110 U. S. 421, 28 L. ed. 204, 4 Sup. Ct. 122. And by an Act of 1875, state banks and state banking associations were required to pay a like tax on the amount of their own notes used for circulation and paid out by them. *Hollister* v. *Mercantile Institution,* 111 U. S. 62, 28 L. ed. 352, 4 Sup. Ct. 263. By reason of such taxation state banks of circulation ceased to exist in this State. *State* v. *Franklin County Sav. B. & Tr. Co.,* 74 Vt. 246, 62 Atl. 1069.

After the enactments of 1862 and 1863, making treasury notes legal tender for the payment of debts, the Federal Supreme Court, speaking through Mr. Chief Justice Chase, said there were "two descriptions of lawful money in use under the Acts of Congress, in either of which damages for nonperformance of contracts, whether made before or since the passage of the Currency Acts, may be properly assessed, in the absence of any different understanding or agreement between the parties. * * * When, therefore, it appears to be the clear intent of a contract that payment or satisfaction shall be made in gold and silver (coin), damages should be assessed and judgment rendered accordingly." *Bronson* v. *Rodes*, 7 Wall. 229, 19 L. ed. 141; *Butler* v. *Horwitz*, 7 Wall. 258, 19 L. ed. 149; *Dewing* v. *Sears*, 11 Wall. 379, 20 L. ed. 189. But, as already observed, if a contract be for the payment of money, without any stipulation as to the kind of money, it is an engagement to pay with lawful money of the United States, and may always be satisfied by payment with legal tender notes. This distinction is made in one of our own cases, in which is the further holding that in cases involving these different kinds of money and their use under the laws of the United States, the decisions of the Federal Supreme Court are binding in authority upon this Court. *Townsend* v. *Jennison*, 44 Vt. 315.

In *Thorington* v. *Smith*, 8 Wall. 1, 19 L. ed. 361, the contract was for the payment of Confederate notes, made during the Civil War, the parties residing within the so-called Confederate States. It was held that this currency must be considered in courts of law in the same light as if it had been issued by a foreign government, temporarily occupying a part of the territory of the United States; that contracts stipulating for payment in such currency, could not be regarded for that reason only as made in aid of the war, and so should be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation; that it is quite clear that a contract to pay dollars, made between citizens of any state of the Union, while maintaining its constitutional relations with the National Government, is a contract to pay lawful money of the United States, and cannot be modified or explained by parol evidence; but that it is equally clear, if in any other country, coins or notes denominated dollars should be authorized of different value from the coins or notes which are current here under that name,

that in a suit upon a contract to pay dollars, made in that country, evidence would be admissible to prove what kind of dollars was intended, and should it turn out that foreign dollars were meant, to prove their equivalent value in money of the United States; that the Court was clearly of the opinion that such evidence should be received in respect to such contracts, in order that justice be done between the parties, and that the party entitled to be paid in the Confederate dollars can recover their actual value at the time and place of the contract, in lawful money of the United States. The holdings in that case were followed in *Bissell* v. *Heyward*, 96 U. S. 580, 24 L. ed. 678, and in *Rives* v. *Duke*, 105 U. S. 132, 26 L. ed. 1031.

Specie payment was suspended by banks and by the United States Treasury, December 30, 1861. The first legal tender act was passed February 25, 1862, followed by others of similar import the same year and the next. Under the conditions existing then and thenceforth during the war period and for some years thereafter, paper currency was at a discount in gold, ranging from $97.68 in 1862, to $35.09 (the lowest), July 11, 1864. Although from the latter date onward its valuation was in a state of fluctuation, the general trend was upward, resulting in an act of Congress, passed in 1875, providing for the payment of treasury notes in coin after January 1, 1879. With the resumption of specie payment had accordingly, depreciation of paper currency ceased, and ever since that time such currency has been convertible into gold and silver at the will of the holder, its specie value being the same.

In *The Steamship Telegraph* v. *Gordon*, and *The Propeller Mary J. Vaughn* v. *Gordon*, 14 Wall. 258, 20 L. ed. 807, an appeal in admiralty from the decree of a United States Circuit Court (decided in 1872), the libel was for the loss of a large quantity of barley by the negligence of the persons navigating the said propeller, or by the negligence of the persons navigating the said steamboat, or by their joint negligence. The barley was shipped from a certain port in Canada. The estimate of the damages was made in the currency of Canada, which was equivalent in value to the gold coin of the United States. It was admitted that the decree was solvable in legal tender notes, which were then largely depreciated, but it was held by the District Court, in which the suit was brought, that this was an incident of the suit in the forum where it was brought, and the result was

unavoidable.    In the circuit court the same rule of damages was
applied, but the decree gave the value of the Canada currency in
legal tender notes.    The Supreme Court held that upon the rule
of damages applied by both courts as respects the kind of cur-
rency in which the value of the barley was estimated, the libel-
ants were entitled to be paid in specie or its equivalent; that the
decree under consideration presented the same question which
was decided in *Knox* v. *Lee,* one of the Legal Tender Cases;
where the court below instructed the jury that in assessing the
damages they might take into account the fact that the judg-
ment could be paid in legal tender notes, the correctness of which
instruction was affirmed upon error.    The suit of *Knox* v. *Lee*
(decided in 1871) was brought in the court below by the defend-
ant in error, to recover the value of certain sheep, confiscated as
the property of an alien enemy, and sold under the authority of
the so-called "Confederate Government," March 7, 1863.    The
defendant in error, in connection with others, perhaps, became
the purchaser at said sale.

.    By the several coinage acts of Congress, gold and silver
coins of the United States are made legal tender in all payments,
according to their nominal or declared values.    *Trebilcock* v.
*Wilson,* 12 Wall. 687, 20 L. ed. 460.    Mr. Justice Field, in writ-
ing the opinion in that case, says the Legal Tender Act of 1862
itself distinguishes between the two kinds of dollars, *i. e.,* coin
and treasury notes; and that contemporaneous and subsequent
legislation of Congress has distinguished between the two kinds,
"recognizing that the notes and the coin were not exchangeable
in the market according to their legal or nominal values."
Thereon Mr. Justice Field says: "The practice of the govern-
ment has corresponded with the legislation we have mentioned.
It has uniformly recognized in its fiscal affairs the distinction in
value between paper currency and coin.    Some of its loans are
made payable specifically in coin, whilst others are payable gen-
erally in lawful money.    It goes frequently into the money
market, and at one time buys coin with currency, and at another
time sells coin for currency.    In its transactions it every day
issues its checks, bills, and obligations, some of which are pay-
able in gold, while others are payable simply in dollars.    And it
keeps its accounts of coin and currency distinct and separate."

In my judgment the discussions and holdings of the United
States Supreme Court, in the cases to which I have called atten-

tion, conclusively show that the medium of exchange by which everything is to be measured, is the gold and silver coin, "the only full legal tender money in use," and having a value regulated by Congress,which value so regulated is in law unchangeable, except by Congress under the power delegated to it by the Constitution to provide a currency of uniform legal value throughout the states of the Union.   If this be not so, why is it that in every instance where the Federal Supreme Court has been called upon to consider the value of depreciated paper currency in its use in the payment of obligations, the standard taken has been the value of gold coin as regulated by Congress? In no instance, I believe, has the purchasing power of such currency been made the controlling factor by it in determining the matter.   The same principle being applied in the cases involving Confederate notes, and foreign dollars, evidence was held to be admissible to show, not their purchasing power, but their equivalent value in lawful money of the United States.   During the period of suspended specie payment, prices of commodities and of services were fluctuating, some of the time as high, perhaps, as during the World War and since; yet not within that period nor since has that Court said anything indicating that the value of United States coin in its use as money may be shown or considered to be other than as declared by the coinage acts of Congress.   Is not the position that the value of gold and silver coin as regulated by Congress, is conclusive, supported by the statement of Mr. Justice Bradley in the Legal Tender Cases, where he says, in effect, that the very object of the Constitution in making it specially the duty of the General Government to provide a national currency, was to avoid the fluctuations, uncertainties, and insecurities, which otherwise would exist and operate with all the partiality to local interests?   And yet what can be done by a trial court more strikingly illustrative of a doctrine repugnant to this, than to permit a jury, sitting on a negligence case, to take judicial notice that the purchasing power of United States legal tender money (when there is no difference in its value whether specie or paper currency) is less than formerly, and so to consider it in fixing the plaintiff's damages to be awarded by their verdict?

It may be that in such cases, where loss of time or value of services is a proper element of plaintiff's damages, the evidence showing the value of his time or services so lost, may involve

more or less the economic conditions at the time of his injury; but such damages, like all others are nevertheless to be reckoned on the basis of the standard nominal value of the uniform national currency. To say that damages may be assessed according as a jury may view the purchasing power of such currency, is to say that the ever changing price of commodities and services, bought and sold, as looked upon by the jury in each particular case, instead of the gold dollar, constitutes the standard unit of value, a position, in my judgment, so fundamentally unsound, and so dangerous to the just rights of parties, as not to be sanctioned.

Under the holdings of the majority, ''what a door'' is opened to a jury to speculate, conjecture, and guess!

I would hold the ruling under discussion to be reversible error, and remand the case for a new trial on the question of damages only.

SLACK, J., concurs in this dissenting opinion.

### PETITION FOR NEW TRIAL.

[4]    The defendant also bring a petition for a new trial, which was heard with the exceptions. It is a novel application in that it is predicated not upon newly discovered evidence, but newly discovered law. The claim is that the system, equipment, and property of the petitioner, including that involved in the accident in question, was, at that time, in the complete control, operation, and management of the United States Government, under the Resolution of Congress, of July 16, 1918, the Proclamation of the President, of July 22, 1918, and the Bulletin of the Postmaster General of August 1, 1918; that the employees responsible for the accident were those of the Government and not of the petitioner; and that therefore the suit brought by the petitioner was, in effect, against the Government, and could not be maintained; that this point was not raised at the trial, and that the law of the subject was then so unsettled and uncertain that the petitioner was excused for omitting to make this defence.

We have before us, then, a record showing a trial, full and fair, a review disclosing no error, and a·petition asking that a retrial be granted to enable the defeated party to take advantage of a defence then available, but not presented through counsel's

misapprehension of the law.    That such an application should be looked upon with disfavor, and should not ordinarily be granted is quite apparent.    That it will not be granted except in very exceptional cases is equally so.    Any negligence or other fault on the part of the petitioner or his counsel will defeat it. ' *Webb* v. *State*, 90 Vt. '65, 96 Atl. 599.    Any less stringent rule would open the door to a practice which might overwhelm this Court with applications of this character and submerge it in a fathomless sea of disputation.

The Webb Case above cited is not a precedent for the petitioner; for there, the action of the court itself in some measure misled the petitioner, and he lost his opportunity for a review. And, too, each case must stand on its own merits. *In re Ketchum,* 92 Vt. 280, 102 Atl. 1032. · In considering the merits of the petition before us we will assume that the facts set forth in it would afford a complete defence to the action against the petitioner, and that the power 'of this Court in the matter of new trials is broad enough to warrant the relief prayed for.    Even then, we think the application should be denied for lack of diligence. Several decisions, in both state and federal courts, pointing directly toward the result contended for by the petitioner here, had been handed down before the trial below.    But disregarding these, it appears that the petitioner was, at that time, in possession of information obtained at first hand, which, if communicated to its counsel, would have made it the clear professional duty of the latter to raise these questions at the trial, and the omission to do so such negligence as to disentitle the former to relief.

This very petitioner had made these very points—or at least those that are fundamental here—in defence of a Massachusetts proceeding to enforce an order regarding intrastate rates, and had obtained therein a decision of the Supreme Judicial Court of that state in its favor, several months before this suit was brought, and a year before it was tried.    *Public Service Com.* v. *New England Tel. & Tel. Co.,* 232 Mass. 465, 122 N. E. 567, 4 A. L. R. 1662.    The unanimous decision of that court, which left little to be said in answer to the petitioner's claim as to the law, was expressed by Chief Justice Rugg in what Chief Justice White, on June 2, 1919, when it was affirmed by the United States Supreme Court, declared to be a "lucid opinion". *Macleod* v. *New England Tel. & Tel. Co.,* 250 U. S. 195, 63 L. ed. 934, 39

Sup. Ct. 511. By that opinion it was made plain that the Government had not assumed a mere public supervision over the operations of private owners of telephone lines, but an absolute and complete possession and control of their systems, their equipment and appurtenances, their materials and supplies; that, this being so, the United States, though not named on the record, was the real party defendant; and that, inasmuch as a sovereign cannot be impleaded in a judicial tribunal except by its consent, the suit could not be maintained. The Massachusetts case involved the matter of rates only; but, as argued, the principles applied are those on which this petition is predicated.

The failure of the petitioner or its legal department to call these decisions to the attention of its local counsel was without adequate justification or excuse. It must have known about them; and if it chose to allow the trial below to proceed without communicating this information to the counsel in charge of the case, it must abide the result. See *Rawleigh & Co.* v. *Pierce*, 92 Vt. 44, 102 Atl. 96.

*Petition dismissed with costs.*