## STOKES v. UNITED STATES.
### No. 406.

Circuit Court of Appeals, Second Circuit.
July 13, 1944.

James B. M. McNally, of New York City (Tompkins, Boal & Tompkins and Arthur M. Boal, all of New York City, of counsel), for respondent-appellant.

Simone N. Gazan, of New York City, for libellant-appellee.

Before AUGUSTUS N. HAND, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

■ 1. Respondent contends that the libellant's damage was caused by his own negligence in not discharging his duty, as representative of the owner, to examine the governor and put it in seaworthy condition, and that therefore he cannot make that neglect of that duty the basis of his claim, citing United States Steel Products Co. v. Noble, 2 Cir., 10 F.2d 89. Assuming for the moment that, as found by the trial judge, libellant was guilty of negligence, we cannot agree with respondent's contention. For there is sufficient evidence that the flywheel was defective, and that, if it had not been, the generator could have been stopped in sufficient time, on January 18, 1943, to prevent the bursting of the flywheel. Called by the respondent, the witness Crum, in charge of the metallurgical laboratory of the American Bureau of Shipping, testified that "parts of" the flywheel were "not a sound casting" of cast-iron, that its porosity was "a little excessive," it being in a "spongy porous condition," that "porosity" had an "effect on the bursting speed of the wheel," and that "porosity is an indication of weakness, and the weaker or stronger the metal the lower bursting speed would be required to cause a failure." Marsters, the first assistant engineer, in a statement made on January 18, shortly after the accident, said, "If the flywheel had not disintegrated until a moment later I would have succeeded in shutting off the steam which would have stopped the generator"; later he testified that he "thought if the wheel was perfect it would never have broken" and that "the flywheel must have been defective or it wouldn't have broken." Libellant similarly testified. On the assumption that libellant was negligent as found, here is a case in which the unseaworthiness of the flywheel was a concurrent cause which made it proper to "divide the damages." And we incline to the belief that, in such a case, division on a 30%–70% basis is not erroneous

**2.** We need not decide that question. For we agree with the libellant that the findings as to his negligence are not adequately supported by the evidence.

The only eyewitness who testified before the trial judge concerning libellant's conduct was libellant himself.[1] All the other evidence on that subject consisted of statements, by deposition or otherwise, of witnesses whom the trial judge neither saw nor heard. We are, therefore, in as good a position as the trial judge to evaluate that testimony and to draw inferences from it. In such circumstances, it has frequently been held, we are not bound by his findings.[1a]

Libellant testified that Kegerries, second assistant engineer, had told him in Philadelphia that the previous chief engineer, libellant's predecessor, having been informed of an instance when there had been excessive speeding up and because of "trouble with the generator," had told Kegerries "to close in on the steam valves"; that Kegerries had reported to him the speeding up of the generator on December 28, 1942; that libellant had then carefully investigated, testing by an indicator, and had found nothing wrong. True, libellant did not make a test without a load, nor did he disassemble the governor to check its parts. But his reasons for not doing so were entirely satisfactory: Here was a new ship; upon examining the operations, he found them satisfactory; after testing the governor, he regarded Kegerries' report as showing no defects in the governor. Libellant testified further that it was his opinion when the ship sailed from Philadelphia on December 29 that the governor was in first-class condition, and that no speeding up occurred on the voyage before the accident on January 18.

Kegerries said in his deposition that only "minor trouble" had been experienced before the accident; that once on his watch, before libellant joined the ship, the generator had speeded up abnormally and that this had occurred a second time on December 28 when the ship was at Philadelphia. Kegerries further testified that, although when on watch he always made entries in the engine-room log, he made no entries concerning excessive speeding up. On one of the two occasions of what he called excessive speeding up, he said that he was "fooling around" with one of the dynamos, and that to cut down the speed he had closed "the steam off" and then "built it up to the speed again" so that he "could cut it into the other dynamo" which was running normally. Thus Kegerries' testimony, so far as it differs from libellant's, shows at most an instance of speeding up on December 28, before the ship left Philadelphia. It does not show that anything of the sort occurred during the subsequent journey prior to the accident.

Baldwin, third assistant engineer, in his brief deposition, said that on one occasion the governors had not operated promptly enough, and that he had then, under instructions from libellant, tested the speed after adjusting the governor's set screw, and that "it was running the right speed." There is nothing in his deposition to show that this incident occurred after the ship left Philadelphia.

The evidence on which respondent principally relies to sustain the finding of libellant's negligence is the deposition of Marsters given on November 2, 1943. Previously, on January 18, 1943, Marsters had made a statement in which he said, "There was no trouble with the generator or any machinery on the voyage South to the Canal Zone. We had the usual minor troubles." After he made that statement, he began suit against the ship, on July 23, for the damages to him resulting from the accident. There ensued settlement negotiations conducted by his lawyer; Marsters was aware that they were progressing favorably. Two or three weeks before his deposition, his lawyer and the defendant in his suit had agreed on a settlement figure of $8,500. The formal settlement at that figure occurred on November 3, the day following the principal part of Marsters' deposition; the settlement check was dated October 28, at or about which time defendant's lawyer received assurance from Marsters' lawyer (so the latter testified in a deposition) that "in my judgment it

---

[1] An expert witness, who made certain assumptions as to libellant's conduct, did testify in the presence of the court. But that expert was not an eyewitness of libellant's conduct.

[1a] See, e.g., The Coastwise, 2 Cir., 68 F.2d 720, 721; Equitable Life Assur. Co. v. Irelan, 9 Cir., 123 F.2d 462, 464; Fleming v. Palmer, 1 Cir., 123 F.2d 749, 751; Midwood Associates v. Commissioner, 2 Cir., 115 F.2d 871, 872; United States v. Mitchell, 8 Cir., 104 F.2d 343, 346.

would be accepted, but I did not guaranty it," because, so he said, Marsters had not finally given his approval. Marsters' lawyer further testified that, at defendant's suggestion, he did not "discuss the figure" with Marsters until after Marsters' deposition on November 2. Marsters came to his lawyer's office on November 3 to execute the releases. In his deposition on November 2, he testified that there had been some "trouble" at Guantanamo Bay and at Colon, and that on each of those occasions he had suggested to libellant that the governor be adjusted. But he was unable to explain why, in his January statement and in an interview in August about the accident with libellant's lawyer, he had not intimated any belief that the accident had been due to failure to adjust the governor and had not mentioned that he had suggested adjustment of the governor to libellant. Asked by libellant's lawyer whether he did not know of a pending settlement of his suit, he replied, "No sir, I do not * * * I don't know anything about a settlement." When, a few days after the settlement was made, libellant's lawyer, on November 9, 1943, further examined Marsters, on a second deposition, Marsters showed his animus: Asked about the statement he had made in January, he replied: "How can you use any statement against me, because my case is settled * * * I don't know as I need to talk to you * * * I will answer nothing. I am not paid for com-

ing here." He made no entries in the log book concerning excessive speeding. In all the circumstances, if his testimony tended to show such speeding, it is entitled to no credence. But even in his deposition, Marsters did not testify that there had been excessive speeding of the engine or any fault with the governor in controlling the flywheel's speed. He said merely that at Guantanamo Bay the generators "speeded a little bit * * * but nothing—nothing exorbitant * * * They * * * speeded up a little, which they will"; and that at Colon they "speeded up just slightly—a little faster." We think that Marsters' testimony does not support a finding of defendant's negligence.[2]

We have, then, these significant facts: (a) To the date of the accident, the logbook contains not a single reference to any excessive speed, or any trouble with any of the generators. (b) There is no credible evidence contradicting libellant's testimony that, after the ship left Philadelphia, there was no speeding up. The findings of the trial judge, that on the trip to the Canal Zone the outboard generator had twice speeded up slightly above normal when the load was taken off and that this was known to libellant, is therefore not supported by the evidence. For, as we have seen, even Marsters did not in his deposition say that such speeding up occurred on the journey to the Canal Zone;[3]

[2] It is also to be noted that, according to his testimony, his suggestions to libellant did not relate to excessive speed but merely to slight differences in the revolutions per minute as between the three generators. "Q. At what speed are these generators designed— A. 400 revolutions per minute. Q. And at what speed did you run them? A. They were operating at 395—two of them—and one at 385. Q. The 385 was which one? A. Was the center one. Q. The center one. When the breakers went out and the lights went off, did any of the generators speed up? A. This outboard one apparently has a tendency to speed up. In fact, the two of them will speed up slightly, see. The two generators will speed up slightly. Q. Which one speeded up most? A. Well, I could not say. I think the outboard one speeded up most. That is the one they had trouble with. Q. Did you discuss that with the chief? A. Yes sir. Q. What did you say to the chief about it? A. I said, 'The generators should be tested and the governor should be adjusted so as to have equal speed.' Q. Now what do you mean

by 'equal speed'? A. Each one would run 400, or they should be up to speed. I didn't know what speed they were running at that time. Q. What did the chief say? A. He said, 'Leave it alone; adjust them with the rheostat.' Q. What does adjusting the rheostat do? A. It just equalizes the load on each generator. * * * Q. Did you suggest to the chief any particular adjustment to make on the governor of this outboard generator? A. I did. I did. Q. What did you suggest? A. I suggested to test the generators and see what speed they were, and adjust the governor accordingly so they would have equal speed. Q. What did he say? A. He said, 'Leave it alone.' We would adjust them with the rheostat."

[3] Even if Marsters' testimony is to be believed, he did not, after Philadelphia, note or report any abnormal speed but merely inequality in the revolutions, a fact which indicated no defect in the generator's operation and called for adjustment through the rheostats—which is precisely what libellant ordered.

Kegerries merely testified that such speeding up had occurred at Philadelphia; and Baldwin, testifying in his deposition to one such incident, did not say when it occurred. Accordingly, we think that the findings of fact and inferences on which the trial judge based his conclusion that libellant was guilty of negligence were "clearly erroneous."

■■ 3. We cannot say that, on this record, the trial judge erred in allowing $7,500 for pain and suffering. We think that the trial judge's method of computing libellant's loss of earning power was not erroneous. We see no error in the refusal to make a deduction for income taxes in the estimate of libellant's expected earnings; such deductions are too conjectural. Libellant, having left the marine hospital, is not entitled to recover the fees paid to his own physician or his private hospital expenses.

The decree should be modified so as to add, as of February 29, 1944, the 30% deducted by the trial judge.

Affirmed on respondent's appeal; modified on libellant's appeal.

AUGUSTUS N. HAND, Circuit Judge (dissenting in part).

I agree with the statement in Judge FRANK'S opinion that "on the assumption that libellant was negligent as found, here is a case in which the unseaworthiness of the flywheel was a concurrent cause which made it proper to 'divide the damages' ", but I cannot agree that we are justified in disregarding the effect of the findings of the trial judge that: "The governor on this particular engine had on two prior occasions failed to check the speed of the engine promptly, when the load was suddenly taken off the generator and the engine speeded up slightly. This was known to the libellant"; and that: "The libellant had this generator engine tested as to speed with the load on, but did not make any test of it with the load off." These findings, if correct, I think clearly justified the decree whereby a partial abatement of libellant's damages was required because of his own contributory negligence.

Libellant testified that on December 28, 1942, he was told by the second assistant engineer that the generator had speeded up with him that day and that he had been informed that on a prior occasion there had been trouble with the generator. In spite of this, libellant made no test of the generator without a load. His only explanation was that "as long as our generators are running with the load inside of our speed limits, and we are having no trouble with it, there is no necessity of testing without a load". The testimony by libellant as to the speeding up was confirmed by the depositions of the second assistant, Kegerries, and of the third assistant, Baldwin.

Wilson, the Assistant Chief Surveyor of the American Bureau of Shipping, who was undoubtedly an accredited expert, testified that there is no safe way of testing an engine which had been speeding up and has not been checked sufficiently by the governor, except suddenly to release the load in order to make sure that it holds the speed without running away.

The fact that the generator did not speed up between the time the ship left Philadelphia December 29, 1942, and the date of the accident, January 18, 1943, would not seem to me to affect the findings of the district judge. We do not know whether the load was taken off for any reason during that period; we only do know from the testimony of the various witnesses that the governor had not worked properly on more than one occasion, that libellant, who was in charge of the engineroom, knew of this fact, and that he had not taken pains to get at the root of the difficulty and had failed to make a test that would certainly disclose whether the defect in the governor continued to exist—a test which a competent expert said was the only safe way of testing the machine.

If there was ever a question of fact for resolution by a trial court I think there was one here. The evidence seems not only to justify but indeed to require the findings that were made by the trial court which in any event cannot be said to have been "clearly erroneous."

Undoubtedly the trial judge departed from the beaten track in apportioning the damages according to fault instead of dividing them equally. In spite of some hesitation I am prepared to approve of an apportionment of damages in suits in admiralty for personal injuries though the Supreme Court left the question open in The Max Morris, 137 U.S. 1, 15, 11 S.Ct. 29, 34 L.Ed. 586. The great authority of Judge Addison Brown seems to support an apportionment according to fault. Such, I think, was the effect of his decision in

The Max Morris, D.C., 24 F. 860, and in The Frank and Willie, D.C., 45 F. 494. When apportionment according to fault is the rule under the Jones Act, it would seem unreasonable to impose another rule upon a seaman because he is compelled to sue the government in admiralty. The H. A. Scandrett, 2 Cir., 87 F.2d 708.

For the foregoing reasons I think the decree of the District Court should be affirmed.