CATHERINE TENORE, ETC., *ET AL.*, PLAINTIFFS-RESPONDENTS, v. NU CAR CARRIERS, INC., DEFENDANT-APPELLANT.

Argued on January 6, 7, 1975—Decided June 18, 1975.

Mr. *Myron J. Bromberg* argued the cause for appellant (*Messrs. Porzio, Bromberg & Newman,* attorneys; Mr. *Bromberg,* of counsel and on the brief).

Mr. *Douglas C. Greenfield* argued the cause for respondents (*Messrs. Stanley W. Greenfield, Douglas C. Greenfield,* attorneys).

The opinion of the Court was delivered by
PASHMAN, J. This is a wrongful death action in which plaintiff appealed a $200,000 jury verdict contending that the trial court had erroneously refused to allow expert economic testimony concerning inflationary trends on the issue of future wage losses of the deceased. In an unreported opinion, the Appellate Division concluded that the evidence should have been admitted and ordered a new trial on the issue of damages only. We granted defendant's petition for certification, 66 *N. J.* 319 (1974), to consider the proper scope of expert testimony in this context.

The deceased, Richard Tenore, a 40-year old union electrician, was killed when he was struck by a wheel that broke free from one of defendant's trucks. The accident occurred on December 27, 1971 while Tenore and another electrician were working on the New Jersey Turnpike in the vicinity of the Newark Airport. At the time of his death Tenore was employed as a foreman by the Daidone Electric Company. In 1971 his gross salary was $20,323.43, exclusive of a $3,000 bonus which was paid to his wife shortly after his death.

In February 1972 Tenore's widow commenced a wrongful death action against defendant Nu Car Carriers, Inc., alleging that its negligence caused her husband's death. The jury found defendant negligent.

In support of the claim for damages, plaintiff offered the testimony of Arthur Schoenwald, an economist who specialized in the practical application of economic principles to problems of valuations. In response to specific questions by the court, the witness stated that his area of expertise included the training of an actuary in the determination of present value of future losses. Having qualified as an expert, Dr. Schoenwald testified that his examination of wage trends over the past 36 years showed an average increase of 5½% a year.[1] In preparing his testimony, the witness extrapolated from these data and applied the projected wage increases to Tenore's most recent base earnings through the year 1996 (Tenore's projected work life expectancy would have been 24 years and 7 months) when the deceased would have reached the normal retirement age of 65.[2] When Dr. Schoenwald attempted to testify concerning his projections of Tenore's salary in future years, however, the court ruled the projections inadmissible:

> THE COURT: . . . I will not allow projection in the future.
> \* \* \* \* \* \* \* \*
> MR. GREENFIELD: May I respectfully ask why \* \* \*?
> THE COURT: Because it is a guess.

It was plaintiff's intention to have the expert testify from a prepared report to specific figures of projected future income and net losses of such income after deduction of personal expenses of decedent had he lived, and then to calculate the present value at a discount rate of 4% of such future

---

[1] The witness found that despite six periods of recession during the 36-year interval from 1936–1972, wage rates increased every year. The rates of increase varied from a low of 1% to a high of 8% or 9%.

[2] The salary used by Dr. Schoenwald was $26,000 per year which was based on the assumption, confirmed by testimony of Tenore's employer, that he was scheduled for promotion to superintendent shortly before his death. The witness also used a 4% rate of wage increase in making his calculations rather than the 5½% figure indicated by the past 36-year history of wage trends.

losses. In the projections the decedent would be shown as earning $35,584 in 1980, $52,672 in 1990 and $64,084 in 1995, the last working year of decedent's statistical expectancy. The report would have shown net future losses to the next of kin in the aggregate sum of $925,361, having a present value at the discount rate of 4% of $559,949. That would have been the figure presented to the jury as the expert's appraisal of the damages in this case.

Plaintiff was also concerned about the admissibility of testimony concerning the effect of income taxes on the deceased's future earnings, and after a discussion held out of the presence of the jury, the court, over objection, decided that the income tax liability on Tenore's earnings could not be brought out on cross-examination.[3]

Despite the total absence of testimony concerning either factor and the court's express ruling on the tax question, the court permitted the jury to consider inflation in fixing damages and instructed them to consider the effect of income taxes upon income which the deceased might have earned had he lived.[4]

---

[3]Counsel for defendant strenuously urged that such an inquiry was a proper subject of cross-examination:

[I]t is my position that I should be permitted to and I understand your Honor is directing me not to conduct such an examination, that I should be permitted to go into, with Dr. Schoenwald, the fact that this family would never have seen all the money that he is talking about because, of course, part of that money would have gone to the United States Government. It is assuming that there is no such thing as income tax, which is unreal.

[4]The relevant portions of the charge are as follows:

I charge you that in assessing money damages to compensate for pecuniary loss that if you find such losses occurred as sustained by the widow and children of Richard Tenore you may take into account the inflationary trend and the lessening of the purchasing power of the dollar at this time.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Any award that you may make for plaintiff, if you do find plaintiff is entitled to a judgment, will not be subject to federal income taxes. Mr. Tenore's earnings during his lifetime would, of course,

Although the jury awarded her a verdict, plaintiff appealed on the basis of the trial court's exclusion of expert economic testimony on the question of deceased's future earnings. In remanding the case for retrial on damages, the Appellate Division reasoned that the economic evidence proffered by plaintiff was relevant to the determination of the aggregate anticipated loss of future earnings resulting from the untimely death of decedent. Acknowledging that this form of evidence "does not enjoy the quality of the absolute," the court nonetheless concluded that it did not warrant dismissal as speculation. Indeed, in the court's view, plaintiff's evidence would have reduced the degree of jury speculation by providing some guidelines for the practical application of inflation to the determination of the survivor's damages. We are only in partial agreement with that conclusion. In our judgment, the Appellate Division was correct in remanding the case for retrial as to the proper measure of damages, and approving expert testimony as to expected inflationary wage trends but not in implying that the witness might be allowed to present his conclusion as to damages in aggregate dollar terms.

I

The fundamental aim of our Wrongful Death Act, *N. J. S. A.* 2A:31-1 *et seq.*, is compensation for the pecuniary losses suffered by the survivors of those killed by wrongful act, neglect or default.[5] In assessing damages for pecuniary

have been subject to such taxes. Therefore, in making any award to plaintiff, you must consider the fact that plaintiff has not lost Mr. Tenore's gross earnings before taxes but only his net earnnigs after taxes.

[5] With respect to the measure of damages under our statute, the Court in *Dubil v. Labate*, 52 *N. J.* 255 (1968) observed:

The amount of the recovery under this standard is based on the contributions, reducible to monetary terms, which the decedent reasonably might have been expected to make to the survivors, and is not related to their needs. *Id.* at 259. *See also McStay v. Przychocki*, 7 *N. J.* 456, 460 (1951) ; *Carter v. West Jersey & Seashore R. Co.*, 76 *N. J. L.* 602, 603 (E. & A. 1908).

loss, the Legislature has directed the jury to award an amount which is fair and just under the circumstances:

' In every action brought under the provisions of this chapter the jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent. [*N. J. S. A.* 2A:31-5 (Supp. 1975-76)].

Under our practice, however, the defendant in a wrongful death action is entitled to have the recovery discounted to present value, a procedure which recognizes that the deceased would have had his income spread out over the remaining years of his working life, had he lived. *See Matthews v. Nelson,* 57 *N. J. Super.* 515, 520 (App. Div. 1959), certif. den., 31 *N. J.* 296 (1960) ; *Kappel v. Public Service Ry.,* 105 *N. J. L.* 264, 265 (Sup. Ct. 1929). *See also Russell v. City of Wildwood,* 428 *F.* 2d 1176, 1181-82 (3 Cir. 1970) ; *Noa v. LeGore,* 131 *N. J. L.* 229, 235-36 (E. & A. 1944).[6]

---

[6]The theory behind discounting a damage award to present value was expressed by Justice Pitney in *Chesapeake & Ohio R. Co. v. Kelly,* 241 *U. S.* 485, 36 S. Ct. 630, 60 L. Ed. 1117 (1916) :

· So far as a verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking account of the earning power of the money that is presently to be awarded. It is self-evident that a given sum of money in hand is worth more than the like sum of money payable in the future. Ordinarily a person seeking to recover damages for the wrongful act of another must do that which a reasonable man would do under the circumstances to limit the amount of the damages. [*Id.* at 489, 36 S. Ct. at 631].

In practice the reduction to present value is accomplished as follows:

· The actuarial approach establishes the present value of destroyed earning capacity on the basis of calculations which assume that income lost during a base year would have been received over a period of years equal to the life (or work-life) expectancy of the person injured or deceased. This sum is then discounted to yield a capitalized value which would pay out (from both principal and interest) a fixed income over the specified number of years. [Peck & Hopkins, "Economics and Impaired Earning Capacity in

At a time when past history and present economic trends prognosticate generally rising wage scales attributable largely to an inflationary cycle, there is no sound reason why the opinion of a qualified expert on that subject should not be made available for the assistance of the jury in appraising damages. Precluding this element from the damage determination would work an injustice upon the survivor, particularly when it is recalled that the verdict awarded the successful plaintiff represents current compensation for future loss.

The difficulty in the present case, however, was not in the trial court's failure to permit the jury to consider an inflation factor, but rather in the exclusion of evidence which was offered to provide expert testimony to guide the jury in its application of inflation to the verdict. We conclude that the jury should, within limitations stated hereinafter, have had the benefit of expert testimony on inflation to provide them with informed guidelines in assessing the effect of future wage increases on plaintiff's losses.

The problem of the effect of inflation upon damage awards is not a new one, but in the past the question has usually come before the courts either in the context of permitting the jury in the first instance to consider it in fixing damages, or in recognizing changes in the purchasing power of the dollar in reviewing verdicts. *See generally* Annotation, "Changes in the cost of living or in the purchasing power of money as affecting damages for personal injuries or death," 12 *A. L. R.* 2d 611 (1950) ; Note, 48 *Colum. L. Rev.* 264 (1948).[7] *See Andryishyn v. Ballinger,* 61 *N. J. Super.*

Personal Injury Cases," 44 *Wash. L. Rev.* 351, 353 (1969)].
*See also* O'Connor & Miller, "The Economist-Statistician: A Source of Expert Guidance in Determining Damages," 48 *Notre Dame Lawyer* 354 (1972).

[7]Illustrative of early recognition that inflation should be considered by the jury in assessing damages are the following views of Powers, J. in *Halloran v. New England Telephone & Telegraph Co.,* 95 *Vt.* 273, 115 *A.* 143 (1921) in which the court affirmed a judgment for

386 (App. Div. 1960), certif. den., 33 *N. J.* 120 (1960) where the court observed that, in general, damages must be left to the discretion of the jury, "and the value of the award must be appraised in light of existing economic conditions." *Id.* at 393. *See also Cermak v. Hertz Corp.,* 53 *N. J. Super.* 455, 465 (App. Div. 1958), aff'd *per curiam,* 28 *N. J.* 568 (1959); *Cabakov v. Thatcher,* 37 *N. J. Super.* 249, 258 (App. Div. 1955); *Paparazzo v. Perkel,* 16 *N. J. Super.* 128, 133 (App. Div. 1951); *Moore v. Public Service Co-ordinated Transport,* 15 *N. J. Super.* 499, 512 (App. Div. 1951); *Dandrea v. Centofante,* 13 *N. J. Super.* 445, 447 (App. Div. 1951); *Bardack v. Extract,* 13 *N. J. Super.* 350, 356 (App. Div. 1951); *Nusser v. United Parcel Service,* 3 *N. J. Super.* 64, 69–70 (App. Div. 1949); *Bowes v. Public Service Ry.,* 94 *N. J. L.* 378, 379 (Sup. Ct. 1920); *Clif-*

plaintiff based on instructions permitting the jury to consider the impaired purchasing power of the dollar:

The result sought by the law in assessing damages in such cases is compensation — so far as a money payment can — the ascertainment of such a sum as will compensate the plaintiff for the injury. Necessarily, damages are to be expressed in terms of money. And while money is the standard of value by which the worth of all other property is to be measured, and while, in theory, its value remains constant and unfluctuating, and while it must be admitted that really it is prices which rise and fall amid changing economic conditions, yet, after all, in a very real and practical sense money itself is a shifting standard, varying in value according to the changes in its purchasing power. As a medium of exchange, its value appreciates or depreciates according to the rise and fall in commodity prices. So it is that, at least so far as those elements of damages properly classed as pecuniary losses — like loss of time, loss of earning power, expenses and the like — are concerned, it is proper for the jury to take into consideration the fact, known to everybody, that the purchasing power of money is at present seriously impaired. And it is so held by the courts. [95 *Vt.* at 276, 115 *A.* at 144].

*See also Spangler v. Helm's New York-Pittsburgh Motor Exp.,* 396 *Pa.* 482, 153 *A.* 2d 490 (1959) in which the court sustained a verdict in excess of $46,000 in a wrongful death-survival action stating:

[T]he cost of everything is higher today than it was before the silver dollar began its Cape Canaveral ascent into the spiral spaces of inflation. [396 *Pa.* at 488, 153 *A.* 2d at 494 (Musmanno, J.)].

*ford v. McCloskey,* 13 *N. J. Super.* 96, 97–98 (Law Div. 1951); *McStay v. Przychocki,* 9 *N. J. Super.* 365, 369 (Cty. Ct. 1950), aff'd, 10 *N. J. Super.* 455 (App. Div. 1950), aff'd, 7 *N. J.* 456 (1951).

Although inflation has thus often been recognized in a general way in fixing or reviewing damage awards, attempts to introduce expert testimony to provide guidelines for evaluating its impact on future pecuniary loss is a relatively recent development, one which has been applauded by several commentators. One of the leading writers on the subject of wrongful death, for example, has argued:

> \* \* \* [I]n measuring damages caused by the wrongful killing of a husband and father for example, we must strive to be accurate. Any tools that will aid us in this regard should not be ignored. The jurors are not expected to appreciate all the intricacies of economic theory. But they live with inflation every day of the year, and are well able to grasp the basic concepts involved. We do not want merely a reasonable approximation of the plaintiff's loss — we want as accurate an approximation of that loss as possible! [*Speiser, Recovery for Wrongful Death,* § 8:11 at 527 (1966)].

*See also* Leonard, "Future Economic Value in Wrongful Death Litigation," 30 *Ohio State L. J.* 502 (1969).[8]

The principal argument against the admission of expert testimony on the relationship between future inflationary trends and the claimant's pecuniary losses is the assertion that the evidence is unduly speculative.[9] Indeed, in the

---

[8]*But see* 2 *Harper & James, The Law of Torts,* § 25.11 at 1325–26 (1956) where the authors suggest that expert testimony on the question of future loss may not provide "much real help."

[9]*See, e. g., Sleeman v. Chesapeake & Ohio Ry.,* 414 *F.* 2d 305, 308 (6 Cir. 1969) in which the court cautioned:

Nor do we encourage the trial courts of our circuit to explore such speculative influences on future damages as inflation or deflation.

*See also* 2 *Harper & James, supra,* § 25.11 at 1325–26 where the authors acknowledge that while the future value of money is a matter of speculation, ignoring the problem is also speculative:

present case, defendant has characterized this inquiry as a "ridiculous academic exercise."

Although the precise question is one of first impression in our State, many of the courts of other jurisdictions have concluded that expert testimony on the issue of future earnings, while in one sense speculative, in fact reduces the degree of jury conjecture in arriving at a just verdict. As early as 1949 in *Turrietta v. Wyche,* 54 *N. M.* 5, 212 *P.* 2d 1041 (1949), the Supreme Court of New Mexico held that testimony tending to prove plaintiff's future earning capacity in an action for personal injuries was properly admitted. Recognizing that the evaluation of an individual's future earning potential necessarily involves a degree of uncertainty, the court nonetheless concluded that "any evidence that would fairly indicate [plaintiff's] earning capacity, and the probability of its increase or decrease in the future ought to be admitted." 54 *N. M.* at 15, 212 *P.* 2d at 1047.

More recently, in *Krohmer v. Dahl,* 145 *Mont.* 491, 402 *P.* 2d 979 (1965), a wrongful death and survival action, the trial court admitted the testimony and exhibits of a professor of economics which were offered to prove the future earnings of an 18–year old college student. The evidence was admitted over defendant's objection that it was speculative. On appeal, the Supreme Court of Montana affirmed, emphasizing that the economic evidence would reduce the danger of speculation in fixing damages:

Future trends in the value of money are necessarily unknown and so always render such damages speculative in a way we cannot escape. If the estimates represent a straight-line projection of present living costs, they will be frustrated by fluctuations either way. If 'prophecy of change is heeded, frustration will follow if no change, or the opposite change, occurs. When courts have consciously grappled with the problems they have either found all prophecy too speculative and so, perforce, have taken the equally speculative course of betting on a continuance of the status quo; or they have made intuitive and not always very wise judgments that present conditions represent a departure from some imaginary norm to which they think we shall rapidly return. [footnotes omitted].

This court agrees that the testimony and exhibits of Heliker were speculative in nature, but no more so than any other evidence that has for its purpose the proof of future action or events. The issue before the trial judge, as seen by this tribunal, was whether the testimony of Heliker should be allowed, in order to give the jury some basis upon which to reach a conclusion in regard to the possible future earnings of the decedent, or whether to leave the jury unguided and hope that by their common knowledge and sense of justice they might arrive at a more accurate estimation of damages. It appears to us that in this particular case the element of conjecture is reduced significantly by the admission of expert testimony as to the possible future earnings of the decedent. It also appears that this expert testimony is not only the best evidence, but the only evidence available in this case to prove future earnings. [145 *Mont.* at 495, 402 *P.* 2d at 981].

*See also Beebe v. Johnson, Mont.,* 526 *P.* 2d 128 (1974).

In the present case, however, Dr. Schoenwald attempted to project plaintiff's future losses not in general terms but by assuming a 4% rate of increase over decedent's remaining working life. Several courts which have considered the issue recently have specifically endorsed this approach, finding that such a projection is not unduly speculative. In *Plourd v. Southern Pacific Transportation Co.,* 266 *Or.* 666, 513 *P.* 2d 1140 (1973), for example, an economist was permitted to assume a 5% rate of increase over a 23-year period in a personal injury action. In rejecting defendant's argument that the economist's projection was " 'pure speculation,' " the court observed:

In our opinion, however, it is no more speculative to assume that wage rates for plaintiff's employment will continue to increase at least 5% per year for the next 23 years, based upon a history of such a rate of increase durting the past 23 years, than it is to assume that the interest discount rate will remain stationary during the same 23-year period. [266 *Or.* at 677, 513 *P.* 2d at 1146].

A similar conclusion was reached by the court in *Resner v. Northern Pacific Ry.,* 161 *Mont.* 177, 505 *P.* 2d 86 (1973), a wrongful death action brought under the Federal Employers'

Liability Act, in which the Montana Supreme Court reinstated a jury verdict based on a 5% projected rate of wage growth.[10]

We are persuaded that fair and just compensation in wrongful death cases must be based on a jury consideration of the effects of future inflation. It is naive to suppose that the question does not occur to the average juror, particularly in these troubled economic times. In this respect we find the observations of the court in *Scruggs v. Chesapeake & Ohio Ry.*, 320 *F. Supp.* 1248 (W. D. Va. 1970) appropriate:

> The question before the jury was the pecuniary loss which would be suffered by the plaintiff and her son in the future. The probability of increases in decedent's income was certainly relevant to that issue. It seems unlikely that their conclusions will be any less valid from having heard the testimony objected to, and they may be much more correct than otherwise. Inflation is a topic of almost universal discussion and it seems improbable that the jury could avoid taking it into account even in the absence of any testimony about it. The defendant cross-examined [the economist] and also argued its analysis of the trends, which the jury apparently did not accept. [320 *F. Supp.* at 1251].

We conclude, as did the court in *Scruggs*, that "some inflation over a period of years seems to be a fact of life and . . . as a practical matter, juries can scarcely be prevented from considering such elements in their deliberations." 320 *F. Supp.* at 1250–51.[11]

---

[10]On defendant's motion, the trial court in *Resner* reduced the jury verdict which was based on the cancelling effect of a 5% wage increase rate and a 5% discount rate. The reduction was based on the trial court's belief that " 'as a matter of law * * * the question of inflation is speculative, conjectural, uncertain, and is an improper element of damages * * *.' " 161 *Mont.* at 181, 505 *P.* 2d at 88. On appeal the court specifically stated that the trial court was in error for granting the motion to reduce the verdict. *Id. See also State v. Daley*, 287 *N. E.* 2d 552 (Ind. Ct. of App. 1972) (economist projected a 5% annual wage increase in a wrongful death action against the state).

[11]*See also Resner, supra*, where the court, in concluding that future wage increases must be considered in awarding damages,, observed:

██ In our view, therefore, in wrongful death actions, the jury should be instructed that it is permissible for them to consider the impact of inflation upon the survivor's future losses.[12] To reduce the possibility of undue conjecture on the part of the jury, plaintiff should also have an opportunity to offer expert economic testimony on the question to provide them with informed guidelines in their deliberations. *See Evid. R.* 56; *Rempfer v. Deerfield Packing Corp.,* 4 *N. J.* 135, 141–42 (1950). Of course, we recognize that economists may differ in their analyses of past trends and future projections and consequently we anticipate that defendants in wrongful death cases will want to offer the testimony of their own experts in rebuttal. This is a familiar practice in other contexts and we see no reason why the same procedure cannot be resorted to in order to give the jury in death cases the benefit of all available points of view.[13]

In holding that expert economic testimony is admissible in actions for wrongful death on the issue of the effect of in-

---

To do otherwise is to ignore reality. Here, defendant would have this Court take the position of an ostrich with his head in the sand. Economic reality requires us to consider not only what the plaintiff is to receive in theory, but in fact. [*Resner, supra,* 505 *P.* 2d at 91].

[12]*See, e.g., Model Jury Charges — Civil,* § 6.15 at 11 (1972) which provides:

You may also take into account the decrease in the purchasing power of the dollar that may occur, that is, the extent to which inflation will probably reduce the value of money. You may determine to what extent the purchasing power of the dollar will be reduced because of inflation and you should increase the total amount of your award for anticipated future financial losses in order to offset the extent by which inflation will reduce the value of the dollar in the future.

[13]*See Plourd, supra,* 513 *P.* 2d at 1147 where the court observed:

Defendants in such a case are free to disagree and to call witnesses to present computations of present value based upon different assumptions of future wage increases and discount interest rates, including what defendant refers to as "collateral consequences of inflation." It is true, as contended by defendant, that "economists differ on their predictions."

flation on the survivor's future pecuniary loss, we are aware that not all courts share this view.[14] In our judgment, however, it is simply unrealistic to ignore the problem of inflation in this context. Given the enormity of the potential impact of rising costs over a long period of time,[15] we conclude that evidence of informed estimates of future inflationary trends will result in damage awards that are fair and just.

■ ■ We return to the matter of introduction in evidence of tables prepared by the expert witness purporting to show plaintiff's aggregate damages. This is improper for two reasons. In the first place, the tables assume fact findings not within the peculiar expertise of the economic expert. In the second place, the projection of a gross figure before the jury submitted by an expert tends to exert an undue

---

[14]One of the most frequently cited cases for the opposite view is *Sleeman v. Chesapeake & Ohio Ry.*, 414 *F.* 2d 305 (6 Cir. 1969) in which the court remarked:

Of course, the nation's economic history since the 1930's would appear to make the use of present wages as the standard for loss of future earnings somewhat unfair to plaintiffs. But as to the future, the inflation versus deflation debate rages inconclusively at the highest policy levels of our government, in national electoral campaigns, in learned economic journals and is exemplified in the daily gyrations of the stock markets. The debate seems unlikely to be resolved satisfactorily in one personal injury trial. And if testimonial resolution of this factor bearing on the future is attempted, the door is opened to similarly speculative and debatable offsets tending in other directions. [414 *F.* 2d at 308].

*Sleeman's* precedential value on this point, however, is somewhat diminished by the fact that in holding that the district court was in error for failing to discount the plaintiff's judgment to present value on the ground "that inflationary trends would offset" any such reduction, the Sixth Circuit noted that the record provided no evidentiary basis for the trial court's decision on the question. *Id.* at 307. *See also Hoffman v. Sterling Drug, Inc.*, 485 *F.* 2d 132 (3 Cir. 1973); *Magill v. Westinghouse Electric Corp.*, 464 *F.* 2d 294 (3 Cir. 1972).

[15]*See* Note, 4 *Loyola U. L. J.* 359, 360 (1973) where the author observes that "[a] 3% increase in the cost of living per year for 20 years, would shrink a $100,000.00 award down to $54,000.00 in value."

psychological impact leading to the danger of its uncritical acceptance by the jury in the place of its own function in evaluating the proofs.

As to the first point, the tables assume there will never be a lapse in decedent's earning capacity because of illness, incapacity, change of jobs, layoffs, etc. *Cf. Cross v. Robert E. Lamb, Inc.,* 60 *N. J. Super.* 53, 79, 80 (App. Div. 1960), certif. den 32 *N. J.* 350 (1960). They also assume that a substantial share of the family income would not have been consumed by decedent but only his pocket money expense of about $4,223 per year (as to the lack of justification for this assumption see *O'Connor v. United States,* 269 *F.* 2d 578 (2 Cir. 1959)). When these disputable assumptions, as to which the jury should make their own subordinate findings, are taken together with the, at best, guesses by the expert that the rate of annual wage increase will proceed at a 4% level for the entirety of the projected working life expectancy of decedent and that 4% is a fair rate for discounting to present value (in the face of conservative current interest rates of at least double that figure), there is necessarily present in the total resulting damage figure submitted by the expert a substantial risk of unreliability and a considerable degree of non-expert conclusion.

As to the prejudicial capacity before a jury of gross dollar totals submitted in this manner, compare *Botta v. Brunner,* 26 *N. J.* 82, 104 (1958) where the court said:

> We know that as a matter of practice when the *ad damnum* clause is brought to the attention of the jury, the court admonishes them that it only represents the claim of the plaintiff and that their award must be based on reasonable compensation. But it is extremely doubtful whether such admonitions are sufficient to eliminate the figure from their minds as a conscious or unconscious factor in reaching their verdict. [26 *N. J.* at 104].

*See also Cross v. Robert E. Lamb, Inc., supra.*

What we do expect is that the experts will provide the jury with their analyses of trends of future wage in-

creases and discount interest rates generally and that then, giving due regard to credibility, the jury will use those trends and rates in arriving at their own independent single-figure appraisal of plaintiff's pecuniary loss.

## II

Although the trial court in the present case instructed the jury that any award for plaintiff should be based on losses after income taxation and that the award itself would not be subject to federal income taxation,[16] the court refused to allow defendant to pursue the question of taxes on cross-examination. In our view, the trial court erred in this respect. Since plaintiff's losses in a wrongful death action are limited to the value of the deceased's net income,[17] we believe that fairness requires that defendant

---

[16]In. Rev. Code of 1954, § 104 provides in part:
(a) * * * [G]ross income does not include —

\* \* \* \* \* \* \* \*

 (2) the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness.
Treas. Reg.; § 1.104–1(c) (1960) provides:
 (c) Damages received on account of personal injuries or sickness. Section 104(a)(2) excludes from gross income the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness. The term "damages received (whether by suit or agreement)" means an amount received (other than workmen's compensation) through prosecution of legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution.
See also Anderson v. United Air Lines, 183 F. Supp. 97 (S. D. Cal. 1960) in which the court held that the provision is applicable in wrongful death cases.

[17]In a broader context the authors of 2 Harper & James, The Law of Torts, § 25.12 at 1326 (1956) observe that:
 The argument for computing damages on estimated income after taxes is a clear one: this will measure the actual loss. If plaintiff gets, in tax free damages, an amount on which he would have had

have an opportunity to introduce evidence of deceased's tax liability or to develop the matter on cross-examination of plaintiff's witnesses.

The matter of income taxes has concerned the courts in two ways: (1) should future taxes be deducted from future wages in estimating losses from deprivation of future earnings; (2) should juries be told the fact that awards of damages are not subject to income taxes. Different considerations apply to these questions but the courts have frequently dealt with them together. The first problem is addressed to precision in estimating loss of future earnings; the second, to the matter of dissuading the jury from increasing a verdict on the mistaken assumption that the damages are taxable and a desire to make the plaintiff whole as against such tax imposition. See *Abele v. Massi, Del.,* 273 *A.* 2d 260, 261 (Sup. Ct. 1970).

In the past most courts which have been confronted with the problem of the effect of income taxes on damage awards have refused to admit evidence on the issue or to instruct the jury on such issues. *See generally* Nordstrom, "Income Taxes and Personal Injury Awards," 19 *Ohio State L. J.* 212 (1958); Annotation, "Propriety of taking income tax into consideration in fixing damages in personal injury or death action," 63 *A. L. R.* 2d 1393 (1959). Two principal reasons are generally advanced to justify the view that income taxes should be ignored in fixing damages in personal injury or death cases: (1) an individual's future income tax liability is too speculative or conjectural a factor to be considered, *e. g., Stokes v. United States,* 144 *F.* 2d 82, 87 (2 Cir. 1944); *Hall v. Chicago & North Western Ry.,* 5 *Ill.* 2d 135, 125 *N. E.* 2d 77, 86 (1955); and (2) tax matters are too complicated for jury consideration, *e. g., Highshew v. Kushto,* 235 *Ind.* 505, 134 *N. E.* 2d 555, 556 (1956); *Pfister v. Cleveland,* 96 *Ohio App.* 185, 113 *N. E.* 2d 366, 368

---

to pay taxes if he had gotten it as wages, the plaintiff is getting more than he lost.

(Ct. App. 1953), appeal dismissed, 159 *Ohio St.* 580, 112 *N. E.* 2d 657 (1953).[18]

*Stokes, supra* is one of the earliest reported decisions dealing with the problem of income taxes and damage awards and although it is frequently cited as authority for the proposition that income taxes should not be deducted in estimating loss of income, the court resolved the question in an off-hand fashion stating simply that there was no error "in the refusal to make a deduction for income taxes in the estimate of the libellant's expected earnings; such deductions are too conjectural." 144 *F.* 2d at 87.

Sixteen years later, however, the Second Circuit gave the issue a more thorough airing in *McWeeney v. New York, N. H. & H. R. R.,* 282 *F.* 2d 34 (2 Cir. 1970) (*en banc*), *cert.* den. 364 *U. S.* 870, 81 S. Ct. 115, 5 L. Ed. 2d 93 (1960). *McWeeney* was an action brought under the Federal Employers' Liability Act by a brakeman who was injured when he was struck by a railroad freight car. A jury awarded McWeeney $87,000 but when defendant's motion for a new trial was denied, he appealed claiming that the trial court erred in denying ten requests to charge.[19] Defendant's re-

---

[18]*See Nordstrom, supra* at 220, where the author identifies a third argument, *i.e.*, that

> [t]he impact of federal taxes is a matter between the plaintiff and the taxing authorities. The defendant has no interest in whether or not a tax is levied.

*See also* Note, 51 *Colum. L. Rev.* 782, 783 (1951).

In *Huddell v. Levin*, 395 *F. Supp.* 64 (D. N. J. 1975), the court recently advanced an additional argument against considering the impact of income taxes in this context, *e.g.*, that plaintiff, not defendant is entitled to the "Congressional largesse" which the statutory exclusion represents. 395 *F. Supp.* at 87. In the court's view this result is supported by analogy to the so-called "collateral source rule" whereby a tort-feasor is not entitled to reduce damages by resorting to benefits the victim receives from another. *See Patusco v. Prince Macaroni, Inc.*, 50 *N. J.* 365, 368 (1967).

[19]Two of the requests focused on the issue of the relationship between plaintiff's damages and the income tax liability on his future earnings:

quests were intended to caution the jury to calculate plaintiff's future losses on the basis of his net income and to advise them that a damage award is tax-exempt. Defendant's requests brought into sharp focus the dual nature of the inquiry in this context. First, should gross or net income be used to calculate plaintiff's lost earnings; and second, should the jury be advised of the exemption?[20]

Writing for the majority, Judge Friendly held that *Stokes, supra* was controlling and consequently no deduction should be made for income taxes in computing plaintiff's losses. 282 *F.* 2d at 39. Acknowledging that the deduction of taxes from the loss of earning power has a "surface appeal," 282 *F.* 2d at 35, the majority nonetheless concluded that the pragmatic difficulty in instructing the jury on a matter as uncertain as plaintiff's future income tax liability was

---

If you arrive at a verdict under the Court's charge in favor of plaintiff, you will not add any sum of money to the amount of the verdict on account of federal or state income taxes, since the amount awarded to the plaintiff by your verdict is not taxable income to the plaintiff within the meaning of these tax laws.

If your verdict is in favor of plaintiff, you must calculate any past or future loss of earnings on the basis of his net income after deduction of income taxes. [282 *F.* 2d at 35].

[20]The commentators point out that these two aspects of the problem are often confused by the courts. *See, e.g., Nordstrom, supra* at 231–32. The second consideration, that is charging the jury that an award is tax-exempt, usually arises once it has been determined that gross income is the proper measure of damages to prevent the jury from mistakenly assuming that the award is taxable and adding to the verdict to compensate for plaintiff's imagined tax liability. *See* 2 *Harper & James, The Law of Torts,* § 25.12 at 1327–28 (1956). *But see Domeracki v. Humble Oil & Refining Co.,* 443 *F.* 2d 1245, 1251 (3 Cir. 1971), *cert.* den. 404 *U. S.* 883, 92 S. Ct. 212, 30 L. Ed. 2d 165 (1971), where the court clearly identified both issues, holding that:

[I]n personal injuries actions the trial courts in this Circuit must, in the future, upon request by counsel, instruct the jury that any award will not be subject to federal income taxes and that the jury should not, therefore, add or subtract taxes in fixing the amount of any award.

impractical in the ordinary case. [21] The court also conceded that when viewed in isolation, a failure to instruct the jury to consider income taxes "may tend to make verdicts too high," but reasoned that two off-setting factors, inflation and attorneys' fees, would tend to counter-balance what would otherwise be "any excess in the verdict due to failure to deduct income tax." 282 *F.* 2d at 37–38. In holding that no deduction was warranted in the instant appeal, however, the court left open the possibility that there may indeed be exceptional cases in which such a deduction would be appropriate:

> There may be cases where failure to make some adjustment for the portion of a plaintiff's or decedent's earnings that would have been taken by income taxes would produce an improper result, but these are at the opposite end of the income spectrum from Mc-Weeney's. For example, if a plaintiff or a plaintiff's decedent, had potential earnings of $100,000 a year, more than half of which would have been consumed by income taxes, an award of damages based on gross earnings would be plainly excessive even after taking full account of the countervailing factors we have mentioned. [282 *F.* 2d at 38 (footnote omitted)].

With respect to defendant's request that the court simply advise the jury that plaintiff's damages are not taxable, the court correctly observed that unlike the instruction on plain-

---

[21] See 282 *F.* 2d at 36 where the court observes:

* * * [T]he jury must determine not what McWeeney's tax on $4,800 now is but what it would be over his expectancy. In these lower brackets the amount of the tax and its percentage relation to earnings are enormously affected by the number of exemptions. The simple act of matrimony, coupled with the filing of a joint return, would reduce McWeeney's tax from $773 to $620. Is the jury to consider the likelihood of this not unusual occurrence? If the lady brought two children with her, or if these were produced in the ordinary way, the tax would be cut in half, to $380. Each additional child would bring a further tax saving of $110, so that a total of five would make the tax nominal. While such fecundity might be unlikely in a plaintiff of 39 the rule here framed for McWeeney must apply to men who evidence greater interest in marriage and parenthood, and the rise in the birth rate is a phenomenon of our age. [footnote omitted].

tiff's net earnings, "it imposes no new burden on the jury and there is nothing speculative about it," 282 *F*. 2d at 39, thus it would not have been error for the court to give the instruction. However, since there was no evidence that the jury had increased its verdict to account for taxes, the court declined to characterize the omission as reversible error. 282 *F*. 2d at 39–40.

Chief Judge Lumbard dissented. In his view, the judgment should have been reversed because of the trial court's failure to charge the jury that any sum awarded to plaintiff would not be taxable. 282 *F*. 2d at 40. He also argued that the instruction on plaintiff's net income should also be given on retrial if defendant offered evidence of plaintiff's actual taxes in the past or alternatively what an individual in plaintiff's position would normally pay. With respect to the majority's conclusion that in order for the jury to consider the income tax factor, the jury would be subjected to considerable additional evidence, complex computations, and unpredictable variables, the Chief Judge observed:

In my view Judge Friendly greatly overestimates the task which the jury would be called on to perform. As his own opinion points out, all that the defendant needed to do in this case was to take the rate of earnings of the plaintiff — $4,800 a year — and compute the taxes which a bachelor with no dependents would pay on the simple tax form, namely $773. The proposed instruction would merely require the jury to estimate loss of future income on the basis of McWeeney's net income of approximately $4,000 rather than upon his gross income of $4,800. [282 *F*. 2d at 41 (Lumbard, C. J. dissenting.)].22

 *McWeeney*, however, was by its terms applicable only in situations in which damages are governed by federal law, or where the applicable state law is silent on the subject of taxes. 282 *F*. 2d at 39. As a result, the *McWeeney* court found no conflict between its resolution of the tax issue and

---

22*See also Montellier v. United States*, 315 *F*. 2d 180, 186 (2 Cir. 1963) in which the *McWeeney* approach was applied in a wrongful death action brought pursuant to the Federal Tort Claims Act and tried to the court.

its prior decision in *O'Connor v. United States,* 269 *F.* 2d 578 (2 Cir. 1959), a decision applying the Oklahoma law of damages, and which, ironically, contains one of the most articulate arguments in favor of deducting income taxes in computing damages. Plaintiff in *O'Connor* sued the United States under the Federal Tort Claims Act to recover for the death of her husband. In concluding that a deduction should be made, the court observed that it would be "wholly unrealistic" to suppose that federal income taxes would cease or decrease substantially in the deceased's lifetime:

We think that such a deduction should be made. It has been said that future taxes are too uncertain to admit of advanced computation. But it is wholly unrealistic to suppose that, at any time within the limits of the years the deceased could reasonably have been expected to live either the discontinuance or substantial reduction of Federal Income Taxes would occur. The deceased, as a salaried employee, never had in his own hands the amount withheld from his earnings for Federal Income Tax purposes; and his wife and child could have no direct benefit from that part of his earnings. While mathematical certainty is not possible any more than it is in a prognosis of life expectancy and future earnings, nevertheless, an estimate may be made based generally on current rates, from which there should be computed the future income of the deceased after payment of Federal Income Taxes rather than before. [269 *F.* 2d at 584].

In the court's view, such a deduction was also warranted because it discerned an implication in the Oklahoma law of damages that " 'take home' pay is considered the proper basis of earnings." 269 *F.* 2d at 585.[23]

Although the Second Circuit continues to apply *McWeeney* in the "great mass of litigation at the lower or middle reach of the income scale," 282 *F.* 2d *at* 39, *see, e. g., Petition of Marina Mercante Nicaraguense, S. A.,* 364 *F.* 2d 118, 125–26 (2 Cir. 1966), *cert.* den. 385 *U. S.* 1005, 87 S. Ct. 710, 17 L. Ed. 2d 544 (1967), other courts have declined to follow

---

[23]Under the Federal Tort Claims Act, damages are determined by the law of the state where the tortious act was committed. 28 *U. S. C. A.* 1346(b). *See also Hatahley v. United States,* 351 *U. S.* 173, 76 S. Ct. 745, 100 L. Ed. 1065 (1956).

its lead even in cases involving persons of moderate income. In *Brooks v. United States,* 273 *F. Supp.* 619 (D. S. C. 1967), for example, a wrongful death and survival action instituted pursuant to the Federal Tort Claims Act, plaintiff sought damages for the death of her husband, a service technician for a cash register company. Finding that the question was an open one in the jurisdiction, the court felt free to follow "the commands of reasonable justice" and deduct income taxes from the deceased's prospective income. 273 *F. Supp.* at 632.

In deciding *Brooks,* the court emphasized the conceptual differences between personal injury and death actions for purposes of evaluating the income tax problem, a distinction which had often been overlooked in the past:

> [A]sserted want of "sufficient certitude" is most often predicated upon the claim that changes in taxable deductions, such as increases in dependents, may subsequently occur, making impossible any fair calculation of future tax. Such argument may be applicable to a personal injury suit but has little relevancy to a death action. [273 *F. Supp.* at 629–30].[24]

Since *McWeeney* was a personal injury action, the court concluded that the argument advanced by Judge Friendly which raised the possibility of an increase in the size of plaintiff's family and the attendant need of the jury to guess or hear testimony on the matter, was simply not relevant in a death case. 273 *F. Supp.* at 630. *See also In re Sincere Navigation Corp.,* 329 *F. Supp.* 652, 659 (E. D. La. 1971) ; *Meehan v.*

---

[24]This distinction has also been noted by the commentators. In an introduction to a symposium on damages for personal injuries, Charles Alan Wright observed:

> The hard fact — inevitable in a subject which grew first carelessly and then explosively — is that a number of the existing rules cannot be justified in theory. For example, I think a good argument can be made for ignoring income tax in computing damages in a suit for personal injuries, but that it is completely unsound to use earrnigs before tax as a measure in a death action. Authoritative doctrine, to date, has made no distinction between the two kinds of suits. [Wright, "Damages for Personal Injuries — Foreword," 19 *Ohio State L. J.* 155, 157 (1958).

*Central R. R. Co. of New Jersey,* 181 *F. Supp.* 594, 614 (S. D. N. Y. 1960) (reviewing verdict).[25]

The courts of several states have also concluded that income taxes must be recognized in fixing damages in wrongful death cases. In *Floyd v. Fruit Industries,* 144 *Conn.* 659, 136 *A.* 2d 918 (1957), a wrongful death action in which plaintiff sought damages under the Connecticut statutory framework for the death of a passenger who was killed in an automobile accident, the Supreme Court of Errors of Connecticut considered and rejected the reasoning of the cases in which evidence of income taxes was excluded. With specific reference to *Stokes, supra,* and a case which followed it, the court said:

> We are not impressed by the reasoning of these cases. The factor in question is no more uncertain, speculative or conjectural than many of the other factors which must be, and in this case were, submitted to the consideration of the jury . . . . [144 *Conn.* at 672, 136 *A.* 2d at 925].

Consequently, the court concluded that there was no error in allowing defendant to cross-examine plaintiff's accountant and to introduce independent evidence on the question of plaintiff's income tax liability. 144 *Conn.* at 673, 136 *A.* 2d at 926. *But see Gorham v. Farmington Motor Inn, Inc.,* 159 *Conn.* 576, 271 *A.* 2d 94 (1970) (trial court did not err in refusing

---

[25]In *Cox v. Northwest Airlines,* 379 *F.* 2d 893, 896 (7 Cir. 1967), *cert.* den. 389 *U. S.* 1044, 88 S. Ct. 788, 19 L. Ed. 2d 836 (1968), the court adopted an intermediate approach to the problem by holding that effective in 1979 the deceased's salary reached the level at which the

> impact of income tax has a significant and substantial effect in the computation of probable future contributions and may not be ignored.

*See also Hartz v. United States,* 415 *F.* 2d 259, 264 (5 Cir. 1969), where the court concluded that it was permissible for the trial court to consider the impact of income taxes " 'although it might not have erred if it had refused to do so.' " [quoting *Furumizo v. United States,* 381 *F.* 2d 965, 971 (9 Cir. 1967)].

to charge jury that the verdict in a personal injury action would not be subject to income tax).

Almost ten years ago, the court in *Furumizo v. United States,* 245 *F. Supp.* 981, 1014 (D. Haw. 1965), aff'd 381 *F.* 2d 965 (9 Cir. 1967), characterized the deduction of estimated income taxes as "the more modern and reasonable" rule. We agree, and although we are aware that some degree of conjecture is involved in making this adjustment in estimating losses in death cases, we are not persuaded that this degree of uncertainty requires us to close our eyes to reality. We also appreciate the fact that our decision will of necessity inject additional elements of proof into the trial of wrongful death cases. We do not think that the problem will be insurmountable for the trial courts or juries. We decline to give simplicity paramount significance in fashioning the law of damages. Such an approach might aid the judiciary but hardly justice. *Todd v. Sandidge Construction Co.,* 341 *F.* 2d 75, 77 (4 Cir. 1964).[26]

More recently, in *Adams v. Deur, Iowa,* 173 *N. W.* 2d 100 (1969), the Supreme Court of Iowa reached a similar conclusion. *Adams* was a wrongful death action in which the trial court overruled repeated attempts by defendant to offer evidence of deceased's income tax payments for prior years. Recognizing that the weight of authority precluded the proffered evidence, the court nonetheless held that its refusal constituted reversible error. 173 *N. W.* 2d at 104. Finding that future probable taxes are no more speculative than many other elements which a jury must consider in fixing damages in a wrongful death case, the court concluded that:

---

[26]*See also* 2 *Harper & James, The Law of Torts,* § 25.12 at 1327 (1956), where the authors, with specific reference to taxes, point out:

As long as our system stays wedded to the single lump sum recovery, our courts simply have to speculate about the uncertainties of the future. With anything as sure as "death and taxes," the courts are avoiding their responsibilities when they decline to make the best guess they can, once all the reasonably available evidence has been brought before them.

This court is satisfied and now holds it is more realistic, reasonable and fair that a defendant be permitted, in a wrongful death action, to cross-examine plaintiff's witnesses, present evidence, and comment in argument to the jury or trier of the facts, with regard to the incidence of taxes, federal and state, upon a decedent's past and probable future earnings or income as they relate to present value of a decedent's estate. [173 N. W. 2d at 105].

*See also Turcotte v. Ford Motor Co.*, 494 F. 2d 173, 185 (1 Cir. 1974) (under Rhode Island law it was error in a wrongful death action not to consider evidence of plaintiff's income tax liability).

▮▮▮▮▮ We conclude that the approach taken by the court in *Adams, supra* is the most reasonable and just solution to the problem of income taxes and damage awards. Consequently, we hold that under our wrongful death act,[27] defendants must have an opportunity to cross-examine plaintiffs' witnesses to elicit testimony concerning deceased's income tax liability, or to develop the matter by extrinsic evidence, to the end that the jury be enabled to make an informed estimate, based upon the deceased's projected net income after taxes, of the survivor's pecuniary loss.[28] Consequently, plaintiff's recovery must be calculated on the basis of the de-

[27]The decision we announce today is, of course, limited to recovery under our wrongful death act. Accordingly we find it unnecessary to comment upon *Scalise v. Central R. R.*, 129 N. J. Super. 303, 306–07 (App. Div. 1974) which the Appellate Division recently considered the propriety of instructing the jury in a personal injury action that an award would not be subjected to federal income taxation. *See also Stopford v. Boonton Molding Co.*, 56 N. J. 169 (1970) (anticipatory breach of an employment contract entitling plaintiff to a lifetime pension).

[28]For purposes of the present case it is unnecessary for us to consider whether any additional deductions should be considered in computing pecuniary loss in wrongful death cases. We do note, however, that as the relative magnitude of other deductions from deceased's income decreases, thereby reducing the possibility of unfairness, the countervailing consideration of judicial economy becomes more compelling. For present purposes, however, we have no occasion to decide at what point the latter factor warrants the exclusion of other evidence of deductions from the deceased's income.

ceased's net income after taxes giving due regard to the evidence adduced on the deceased's income tax liability. As we have pointed out above, there is a sound purpose in having the court instruct the jury that the damage award is not subject to income taxation itself. This is to prevent a jury which might think otherwise from improperly increasing the verdict to protect plaintiff from the impact of such taxes. In accordance with cases cited above, we therefore direct that such an instruction be given the jury in this type of case.

We do not mean to suggest from the foregoing that the jury in death cases must be given a precise formula and then by complex instructions be asked to compute a verdict with mathematical exactness. *Cf. Moich v. Terminal & Transportation Co.,* 82 *N. J. Super.* 353, 365 (App. Div. 1964); *Andryishyn v. Ballinger, supra,* 61 *N. J. Super.* at 393. *See also Cross v. Robert E. Lamb, Inc., supra. But see Matthews v. Nelson, supra,* 57 *N. J. Super.* at 520. But we have determined that the jury should have the benefit of evidence which will apprise them of the probable impact of income taxes on deceased's future losses. With the benefit of this evidence, the jury, guided by instructions to base future losses on net rather than gross income, can exercise its collective judgment in arriving at a just verdict under all the circumstances.

Affirmed and modified.

*For affirmance as modified*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD and Judge CONFORD—6.

*For reversal*—None.